*565 OPINION OF THE COURT
Edward J. Greenfield, J.
Plaintiff Credit Francais International, S. A., is a French banking corporation headquartered in Paris which was part of an international consortium of nine banks which loaned $25,000,000 to defendant Sociedad Financiera de Comercio, C. A., a Venezuelan financial institution, pursuant to a written deposit agreement entered into on November 24,1980. Plaintiff bank deposited $3,000,000 of the total pursuant to the agreement terms. The agreement provided for repayment of principal and interest in six semiannual installments. The Marine Midland Bank, which is headquartered in New York City, was designated as the agent for the participating banks. It was to receive the payments made by the defendant, to be applied pro rata to the accounts of the participating banks. Defendant made the requisite payments in February and August of 1982, reducing the principal amount owed to the plaintiff to $2,000,000. However, in February and March 1983, the government of Venezuela, in attempting to cope with its problem of foreign debt, adopted certain currency control regulations restricting the use of dollars and calling on all Venezuelan financial institutions to restructure their debt payments, and to suspend all payments of principal until 1986. Thus, while defendant continued to pay interest on the loan, it has made no payments on account of principal in 1983 and 1984.
Plaintiff contends that the failure of defendant to make the payments required constitutes a clear breach of the deposit agreement, and sues for the principal balance owing. Plaintiff has attached sums allegedly owing to the defendant, and this attachment was confirmed by decision and order of Mr. Justice Alvin Klein dated July 5, 1984. Plaintiff now moves for partial summary judgment on the first cause of action in its amended complaint for breach of the agreement. The defendant has cross-moved to dismiss on the grounds of forum non conveniens, and alternatively, for summary judgment on the ground that the Venezuelan decrees prohibiting repayment should be respected and accorded comity, and that plaintiff is not a proper party to bring suit individually under the terms of the deposit agreement.
FORUM NON CONVENIENS
Before dealing with any of the other procedural or substantive issues which are raised on this motion, the court of necessity must determine the threshold issue of whether New York is the appropriate forum for resolution of the dispute, or whether it *566 should be handled elsewhere, since neither plaintiff nor defendant is a New York resident and the critical question of law allegedly involves the interpretation and application of Venezuelan currency decrees. Defendant points out that the suit is brought by a French bank headquartered in Paris against a Venezuelan financial institution with offices in Caracas. Neither plaintiff nor defendant maintains any offices in New York. Defendant professes concern about a possible New York judgment ordering repayment of a Venezuelan debt which is prohibited by the decrees of the Venezuelan government. “Act of State” is asserted as an affirmative defense. (Cf. French v Banco Nacional de Cuba, 23 NY2d 46; Weston Banking Corp. v Turkiye Garanti Bankasi A. S., 57 NY2d 315; Mirabella v Banco Industrial de la Republica Argentina, 101 Misc 2d 767, 768; Allied Bank Intl. v Banco Credito Agricola de Cartago, 757 F2d 516 [2d Cir, Mar. 1985].)
The facts in the Allied Bank case (supra) bear striking similarities to those here involved, although the principles of law involved are somewhat different. Allied Bank had been designated as the agent for a syndicate of 39 banks which loaned money to three Costa Rican institutions subject to control of its Central Bank. The Costa Rican government, through its Central Bank, issued regulations suspending all external debt payments in United States dollars. The debtors then defaulted on their obligations to pay in dollars. Unlike the situation here however, the agent accelerated the debt, and on behalf of the entire syndicate sued in the Federal District Court for the Southern District for the full amount of principal and interest outstanding. The District Court held that since nonpayment was the result of foreign governmental decrees, the agent was barred from suing here by the Act of State doctrine. {Underhill v Hernandez, 168 US 250, 252.) The Court of Appeals reversed, on the ground that the governmental acts of Costa Rica did not affect property solely within the dominion and within the borders of that country, but impinged on an obligation to pay a debt in United States dollars to the syndicate’s agent in New York. The Costa Rican banks had by their agreement conceded jurisdiction in New York, and the court declared (p 521): “The United States has an interest in maintaining New York’s status as one of the foremost commercial centers in the world.”
It is clear that the residence of the parties is no longer the controlling consideration in determining whether or not New York courts are an appropriate forum under CPLR 327 (Silver v Great Am. Ins. Co., 29 NY2d 356; Bata v Bata, 304 NY 51). *567 Ordinarily, New York will continue as the forum chosen by the plaintiff unless it can be demonstrated that there is a better and more appropriate forum elsewhere. (Varkonyi v S.A. Empresa De Viacao Airea Rio Grandense, 22 NY2d 333; Bader & Bader v Ford, 66 AD2d 642, 645.) In such cases, New York may continue to entertain the action unless important policy considerations dictate otherwise, even if there is a minimal nexus between the parties and facts of the action and New York. (See, Aboujdid v Gulf Aviation Co., 108 Misc 2d 175, affd 86 AD2d 564.)
In this case, the lending banks which made up the consortium, other than plaintiff, a French bank, are located in England, Panama, Texas, Minnesota, the Netherlands Antilles and three in the Bahamas. The Marine Midland Bank of New York was designated as agent, and Marine Midland Ltd. of London is designated by the agreement as the manager. It is alleged, however, that the underlying agreement was negotiated in New York, that the text of the deposit agreement was drafted in New York, that payments under the agreement were to be made to Marine Midland in New York and that meetings between the parties to the agreement were held in New York.
Given the multinational character of the agreement, the parties obviously anticipated that situations could arise where disputes might be litigated in any one of a number of jurisdictions, with widely varying results. Therefore, the parties provided that the agreement was to be governed and interpreted in accordance with the laws of the State of New York, the place of payment, and they further provided what is known as a “forum-selection clause” pursuant to which defendant “irrevocably consents that any legal action or proceeding against it or any of its property arising under or relating to this Agreement * * * may be brought in any court of the State of New York or any federal court of the United States of America located in the City and State of New York, or in the appropriate courts in Caracas, Venezuela as the Agent, the Manager or any Depositor may elect”. Defendant appointed an agent headquartered in New York City to receive service of process in its behalf, and agreed to submit to and accept the jurisdiction of the New York courts.
Defendant further explicitly and irrevocably waived “any objection which it may now or hereafter have to the laying of the venue of any suit, action or proceeding arising out of or relating to this Agreement” and further explicitly waived “any claim that the State of New York is not a convenient forum for any such suit, action or proceeding.” It further waived any right that it had to insist on any action in connection with the agreement *568 being brought before a Venezuelan court. Lastly, it waived any right to assert a defense of sovereign immunity with respect to its obligations.
When all the parties to an agreement have designated a particular jurisdiction as the forum for the resolution of their disputes, such a forum-selection clause is “prima facie valid and should be enforced unless * * * ‘unreasonable’ under the circumstances.” (The Bremen v Zapata Off-Shore Co., 407 US 1, 10 [1972].) In that case, a contract between a Texas corporation and a German corporation to tow a drilling rig from Louisiana to Italy contained a forum-selection clause providing for the litigation of any dispute in the courts of England. When a dispute arose, the Texas corporation attempted to bring suit in the United States. The Supreme Court noted that while forum-selection clauses historically had not been favored by American courts because they ousted such courts of their jurisdiction, the correct doctrine to be followed would be to hold that parties could agree in advance to submit to the jurisdiction of a given court and that parties could appropriately choose a neutral forum. Having done so, “absent some compelling and countervailing reason, it [forum-selection] should be honored by the parties and enforced by the courts” (supra, p 12). “The elimination of all such uncertainties by agreeing in advance on a forum acceptable to both parties is an indispensable element in international trade, commerce, and contracting * * * Thus, in the light of present-day commercial realities and expanding international trade we conclude that the forum clause should control absent a strong showing that it should be set aside” (supra, pp 13-15).
The “strong showing” which the party seeking to challenge the agreed upon jurisdiction would have to make would require “the party seeking to escape his contract to show that trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court. Absent that, there is no basis for concluding that it would be unfair, unjust, or unreasonable to hold that party to his bargain” (407 US, at p 18). (See, Restatement [Second] of Conflict of Laws § 80, to the effect that the agreement of the parties as to a forum to hear disputes will be upheld unless it is the result of overreaching, unequal bargaining power, or causes acute inconvenience; accord, Hernandez v Cali, Inc., 32 AD2d 192; Export Ins. Co. v Mitsui S. S. Co., 26 AD2d 436; Mercury Coal & Coke v Mannesmann Pipe & Steel Corp., 696 F2d 315.)
The State of New York has explicitly provided for the enforceability of a choice-of-forum clause (L 1984, ch 421, § 1). That *569 statute, effective July 19, 1984, applies retroactively to contracts entered into earlier, where the action or proceeding has commenced after the effective date. It added a new title 14 to the General Obligations Law. Section 5-1401 (1) thereof provides that: “The parties to any contract, agreement or undertaking * * * relating to any obligation arising out of a transaction covering in the aggregate not less than two hundred fifty thousand dollars * * * may agree that the law of this state shall govern their rights and duties in whole or in part, whether or not such contract, agreement or undertaking bears a reasonable relation to this state.”
Section 5-1402 (1) deals with forum selection. It provides that: “any person may maintain an action or proceeding against a foreign corporation, non-resident, or foreign state where the action or proceeding arises out of or relates to any contract, agreement or undertaking for which a choice of New York law has been made in whole or in part * * * relating to any obligation arising out of a transaction covering in the aggregate, not less than one million dollars, and * * * which contains a provision or provisions whereby such foreign corporation or non-resident agrees to submit to the jurisdiction of the courts of this state.”
While the action herein was commenced shortly before the effective date of the new law, the enactment of the statute now puts beyond argument the policy question of whether New York courts should burden themselves with litigation involving nonresidents where the only nexus is the contractual agreement to designate New York as a forum. We have declared in no uncertain terms that we are prepared to accept jurisdiction of such disputes provided that the matter in controversy is of sufficient substance, so that we are not burdened by the petty disputes of persons from out of State. Earlier cases, which expressed reluctance to jurisdiction based on agreement are no longer a guide. (E.g., Atlas Credit Corp. v Ezrine, 25 NY2d 219; Paragon Homes v Carter, 56 Misc 2d 463, affd 30 AD2d 1052.)
CPLR 327, which spells out the power of the court to dismiss an action for forum non conveniens, has been amended by this enactment. A new subdivision (b) now provides: “(b) Notwithstanding the provisions of subdivision (a) of this rule, the court shall not stay or dismiss any action on the ground of inconvenient forum, where the action arises out of or relates to a contract, agreement or undertaking to which section 5-1402 of the general obligations law applies, and the parties to the contract have agreed that the law of this state shall govern their rights or duties in whole or in part.”
*570 New York, as the center of international trade and finance, has expressly recognized, as a service to the business community, that its courts will be hospitable to the resolution of all substantial contractual disputes in which the parties have agreed beforehand that our neutrality and expertise should govern their relationships. Just as the dollar has become the international standard for monetary transactions, so may parties agree that New York law is the standard for international disputes. (See, Survey of New York Practice, 59 St. John’s L Rev 411, 413-419.)
The fact that there is now a statutory recognition of the controlling nature of a forum selection clause with respect to actions commenced after July 19, 1984 does not mean that New York courts were unwilling to entertain such actions and enforce a forum selection provision prior to that date. Over 50 years ago, our Court of Appeals, in commenting on contractual consent to have disputes tried in a particular jurisdiction, declared:
“Contracts made by mature men who are not wards of the court should, in the absence of potent objection, be enforced. Pretexts to evade them should not be sought. Few arguments can exist based on reason or justice or common morality which can be invoked for the interference with the compulsory performance of agreements which have been freely made * * * Unless their stipulations have a tendency to entangle national or state affairs, their contracts in advance to submit to the process of foreign tribunals partake of their strictly private business * * *
“Public policy, therefore, would not forbid defendants to appoint an agent to accept service or to confess judgment in their behalf, nor does it after service forbid them in person to acknowledge receipt of it. If the fact be clear that in advance of any form of litigation or arbitration they actually intended to contract that in the event of such a proceeding they would render themselves subject to foreign process, the same policy ought to prevail.” (Gilbert v Burnstine, 255 NY 348, 354-357; emphasis supplied.)
In Young & Co. v Leong (53 AD2d 515 [1976], appeal dismissed 40 NY2d 984) the Appellate Division of this department declared that judicial discretion on a forum non conveniens motion should be exercised in favor of retaining jurisdiction when the parties had entered into an agreement that all disputes thereunder should be heard in New York courts and governed by New York law, unless there is a showing of fraud, mistake or that enforcement was contrary to public policy. Thus, *571 even though inconvenience to parties was factually demonstrated and New York did not have “the slightest nexus with the dispute”, jurisdiction was to be exercised in favor of applying the forum selection clause, the court noting that it would not be burdensome to retain the cases here.
In Ideal Mut. Ins. Co. v Elkhorn Reinsurance Co. (NYLJ, Jan. 2,1985, p 6, col 2) Mr. Justice McCooe of this court, in construing a forum selection clause in an insurance contract, relying on Young & Co. v Leong (supra) observed (col 4): “Inherent in such agreement was [defendant’s] promise to refrain from making a motion to dismiss based upon forum non conveniens”.
The public policy considerations as to whether New York should retain jurisdiction of a potentially burdensome foreign dispute have been elucidated by the Court of Appeals at some length in Islamic Republic of Iran v Pahlavi (62 NY2d 474 [1984]). That case did not involve an agreement between the parties designating New York as the forum for disputes. It was an action by the current government of Iran against the former royal family to recover funds allegedly converted by them in Iran in breach of their fiduciary duty to the Iranian people. The government of Iran, as plaintiff, chose New York as the forum to recover assets from the former imperial family, but the defendants strenuously objected. The court agreed with the discretion exercised by Special Term in dismissing the suit on grounds of forum non conveniens. The court stated (pp 478-479): “Ordinarily, nonresidents are permitted to enter New York courts to litigate their disputes as a matter of comity. Obviously, however, our courts are not required to add to their financial and administrative burdens by entertaining litigation which does not have any connection with this State. The common-law doctrine of forum non conveniens, also articulated in CPLR 327, permits a court to stay or dismiss such actions where it is determined that the action, although jurisdictionally sound, would be better adjudicated elsewhere * * * The burden rests upon the defendant challenging the forum to demonstrate relevant private or public interest factors which militate against accepting the litigation (see Piper Aircraft Co. v Reyno, 454 US 235; Bader & Bader v Ford, 66 AD2d 642) and the court, after considering and balancing the various competing factors, must determine in the exercise of its sound discretion whether to retain jurisdiction or not. Among the factors to be considered are the burden on the New York courts, the potential hardship to the defendant, and the unavailability of an alternative forum in which plaintiff may bring suit * * * The court may also consider *572 that both parties to the action are nonresidents (Bata v Bata, 304 NY 51) and that the transaction out of which the cause of action arose occurred primarily in a foreign jurisdiction (Silver v Great Amer. Ins. Co., 29 NY2d 356, 361). No one factor is controlling * * * The great advantage of the rule of forum non conveniens is its flexibility based upon the facts and circumstances of each case * * * The rule rests upon justice, fairness and convenience and we have held that when the court takes these various factors into account in making its decision, there has been no abuse of discretion reviewable by this court”.
The court in that case determined that public policy considerations justified declining to entertain the case, which would involve a sweeping review of the political and financial management of the Iranian government. The taxpayers of this State, they noted, would be required to assume a heavy financial burden in litigating a purely foreign controversy, although the subject matter would have virtually nothing to do with events in New York.
The controlling factors in this case are different. We have a contract formulated and executed in New York, designating a New York bank as the agent to take action on behalf of the members of the consortium should the need arise, and a manifestation of an overriding desire on the part of contracting parties to litigate any disputes in a neutral forum where the government is stable and the law of contract is more or less predictable.
While it is contended that the retaining of jurisdiction by New York courts would require us to review the actions of the Venezuelan government in attempting to deal with its financial crisis by restructuring private debt obligations, as will be developed below the court need not come to grips with the question of passing on foreign governmental decrees. Given the issues presented in this case, it is not necessary to review in detail the effect of the Venezuelan decrees. Hence we are faced with no undue burden placed upon the courts of New York, and no public policy considerations which would compel rejection of the suit.
Rather, public policy favors New York courts retaining lawsuits where New York is the designated forum. The center of world banking, trade, finance and other activities should, and indeed, with the enactment of General Obligations Law § 5-1402, must extend itself to treat with such controversies. New York has had no aversion to dealing with multinational litigation before, even when there were minimal contacts with the State, when business or equitable considerations indicated that it should. (Zeevi & Sons v Grindlays Bank [Uganda], 37 NY2d *573 220.) “It is a financial capital of the world, serving as an international clearinghouse and market place for a plethora of international transactions * * * In order to maintain its preeminent financial position, it is important that the justified expectations of the parties to the contract be protected” [supra, p 227). We have rejected provincialism. (Cf. Aboujdid v Gulf Aviation Co., 108 Misc 2d 175, affd 86 AD2d 564, supra; Animal-feeds Intl. v Banco Espirito Santo e Comercial de Lisboa, 101 Misc 2d 379.)
While New York may previously have exercised discretion to entertain suits when designated as the forum in a contractual agreement, our Legislature has now declared as a matter of public policy that we must permit parties to maintain an action pursuant to a contractual agreement providing for a choice of New York law and forum in cases involving a million dollars or more.
Paragraph 10.06 of the agreement herein provides that “the Agreement shall be governed by and interpreted in accordance with the laws of the State of New York, the place of payment of the Deposits”. Under the agreement, the defendant is obligated to make repayments to Marine Midland Bank as the agent. The repayments are thus to be made to a New York corporation and payable in United States dollars. Indeed, paragraph 3.06 of the agreement explicitly declares: “This is an international loan transaction in which the specification of dollars and payment in New York is of the essence.” While Venezuela may have been designated as an alternative forum, if there were an election to proceed against the defendant there, that is an option open only to a plaintiff, and the parties need not be relegated to action in that jurisdiction if the plaintiff does not so choose. (See, Mobil Tankers Co. v Mene Grande Oil Co., 363 F2d 611; Constructora Ordaz, N. V. v Orinoco Min. Co., 262 F Supp 90, 92.)
Defendant in the agreement “irrevocably consents that any legal action or proceeding against it or any of its property arising under or relating to this agreement * * * may be brought in any court in the State of New York * * * as the Agent, Manager or any Depositor may elect * * * and hereby submits to and accepts with regard to any such action or proceeding, for itself and in respect of its property generally and unconditionally the jurisdiction of the aforesaid courts.” (Agreement para 10.07 [a].)
In paragraph 10.07 (b), defendant “irrevocably waives (i) any objection which it may now or hereafter have to the laying of the venue of any suit, action or proceeding arising out of or relating to this Agreement or any of the Certificates of Deposit in the *574 State of New York, (ii) any claim that the State of New York is not a convenient forum for any such suit, action or proceeding * * * (iv) any right which it may now or hereafter have under the Laws of the Republic of Venezuela to have any action or proceeding in connection with this Agreement or the Certificates of Deposit brought only before a court or tribunal in the Republic of Venezuela”.
The matter could hardly be clearer. Defendant, despite its “irrevocable” commitment and waiver not to object to suit against it in New York on grounds of forum non conveniens, is doing precisely just that. Although it should be estopped at the outset even from making such a claim, the court has nevertheless dealt with it to determine whether the agreement unfairly imposed an undue burden on the courts of New York. It does not.
The agent designated to act on behalf of the lenders is a New York bank. The place of payment is at its office in New York. It is the New York agent who has the responsibility of distributing all payments to each of the participating banks. New York law is expressly declared to be governing. Thus, it cannot be said that the controversy in question is devoid of any nexus with New York even in the absence of the explicit consent to jurisdiction. The fact that a local bank is a paying or collecting agent has in and of itself been deemed a sufficient nexus with New York. (See, Zeevi & Sons v Grindlays Bank [Uganda], supra; Animal-feeds Intl. v Banco Espirito Santo e Comercial de Lisboa, supra.) The parties in this case having bargained for the decision by a New York court under New York law, this court is prepared to go forward on the merits.
LAW OF THE CASE
If New York can appropriately entertain this suit and determine it on the merits, it must next turn to the question of whether the plaintiff has standing to sue. This transaction was handled by a consortium of nine banks of which plaintiff is a member, and an agent was designated to act with the consent of or at the direction of a majority of the participating banks. It is contended that under the plan for “Deposit Agreement”, no individual member of the consortium was empowered to chart its own route or deal with the borrowing institution in a way which would be contrary to the course the other members of the consortium chose. Plaintiff insists that while the agent was authorized to act on behalf of all the member banks of the consortium collectively, nothing precludes it from proceeding by itself, despite the objection that this action does not have the consent of a majority of the members of the consortium.
*575 Justice Alvin Klein, on prior motions confirming an order of attachment, has opined that plaintiff bank could maintain this action even in the absence of other member banks, and that plaintiff in its individual suit has demonstrated a likelihood of success on the merits. Does that constitute the law of the case, precluding this court from examining the issue of plaintiff’s standing to sue as a single member of the consortium?
This court does not consider itself bound by that finding, which is not, in actuality, the “law of the case”. “The doctrine of the ‘law of the case’ is a rule of practice, an articulation of a sound policy that, when an issue is once judicially determined, that should be the end of the matter as far as Judges and courts of co-ordinate jurisdiction are concerned”. (Martin v City of Cohoes, 37 NY2d 162,165.) “What we call ‘the law of the case’ — a prior interlocutory ruling which, when unchallenged, is considered controlling throughout the balance of the litigation — is the pragmatic result of two salutary principles. They are that matters once litigated should not be endlessly relitigated, and that a Judge handling a subsequent aspect of a case should not, in disagreement with a prior ruling by a colleague, sit in appellate review of a Judge of concurrent jurisdiction. (Mt. Sinai Hosp. v. Davis, 8 A D 2d 361; Graham v. Board of Supervisors, 25 A D 2d 250.) Of course, a Judge passing on the earlier stages of a case owes a reciprocal duty to those who come after him to decide no more than what is essential for disposition of the issue before him, and to be prudent and circumspect in the choice of language he adopts, for litigants are apt to put more weight and stress on provisional judicial structures than they are designed to bear.” (Pugatch v David’s Jewelers, 53 Misc 2d 327, 328.)
The key, of course, is whether the issue has, in fact, been “judicially determined”. Many things may be said in the course of a judicial opinion which may be more or less persuasive to the extent that they are logical in analysis. However, care must be made to distinguish between judicial utterances and judicial determinations. This is especially true where judicial comments and observations are made in connection with an application for provisional remedies. On a motion for a temporary injunction, the ruling judge may in the first instance be of the opinion that the applicant has demonstrated a likelihood of success on the merits. He may, in the course of so concluding, give his opinion as to a set of facts or a question of law preliminarily presented. The judicial determination, however, is merely that the temporary injunction shall issue. A subsequent judge conducting a trial on the issue of a permanent injunction is free to make an independent determination, even one which is contrary to the *576 preliminary determination of the Special Term judge. (See, for example, Animalfeeds Intl. v Banco Espirito Santo e Comercial de Lisboa, 101 Misc 2d 379, 382-383, supra.)
Similarly, in a motion dealing with the validity of an attachment, again there must be a preliminary determination as to a jurisdictional basis and the likelihood of success. The judicial determination is that there shall be an attachment. That issue may not be relitigated by a subsequent judge of coordinate jurisdiction. However, a comment or observation as to the meaning of a particular paragraph of an agreement which is to be fully litigated thereafter is not binding on a subsequent judge dealing with a different aspect of the same dispute. Matters then are in a different focus, and while the subsequent judge is not free to alter the determination as to an attachment, he is free to independently construe the agreement, and to arrive at a different conclusion as to its meaning, in connection with making his judicial determination. “A judicial decision can constitute a conclusive adjudication of a question of fact or law only when rendered in a proceeding in which a court had jurisdiction to render an irrevocable and final decision upon such question * * * Though an interlocutory judgment may require the immediate performance of acts which irremediably affect the rights of the parties, and in that sense may be final, yet in so far as it purports to decide the issues litigated in the action, the decision is subject to alteration and revision.” (Bannon v Bannon, 270 NY 484, 490.)
When the relief which is asked for is provisional in nature, it “would leave open for subsequent conclusive adjudication in the same action every issue of fact raised by the pleadings” (supra, p 491).
If it were otherwise, then determination of the application for provisional remedy or interlocutory relief would be the bé-all and end-all of such litigation. Once, for example, a preliminary injunction is granted and some of the issues have been passed on, it would be fruitless to set the matter down for trial if the comments of the judge passing on the provisional remedy were to be thereafter binding as the “law of the case”. The same is true for an interim determination of temporary alimony. (See, Siegel, NY Prac § 448.) “[Findings made for [a] temporary purpose will not bind the judge who has to decide the merits later” (id., at 594). The distinction must always be made between a preliminary ruling and a judicial determination.
Thus, this court concludes that the statement on the attachment motion to the effect that the agreement herein “clearly *577 allows plaintiff to maintain this action even in the absence of other member banks”, as well as the conclusion that the Venezuelan decrees do not prohibit defendant from paying its foreign debts when due, are conclusions which are not “the law of the case”, and are not binding on this court.
When this motion was returnable, the parties requested that it be referred to the same Justice who then had the preliminary application before him. (He had not yet made any decision on the attachment motion.) But that Justice declined the reference and the matter was then sent back to me for determination. I come to the contrary conclusion as to the ability of the plaintiff to maintain this action independently under the terms of the agreement.
STANDING TO SUB
The very nature of the agreement indicates it is not between the defendant borrower and the nine individual lenders. A reading of the agreement as a whole demonstrates clearly that this is a transaction between the borrower and a consortium of lending banks. Indeed, the very title page of the agreement recites that it is an agreement between the defendant and the Marine Midland Bank, N. A. as agent, and Marine Midland, Ltd. as manager. The lending banks are referred to in the contract collectively as “Depositors”.
The interest rate is to be determined on behalf of all the banks by the agent (paras 2.04, 2.05). The six repayments of principal are to be made to the agent for the pro rata account of each depositor (para 2.06). Funds to be made available for advances to the borrower are to be made to the agent in New York in dollars, without setoff or counterclaim (para 2.08). The borrower is to deliver to the agent appropriate certificates of deposit (para 2.09). The books of the agent with respect to advances, repayments and interest are to be conclusive and binding on the borrower and the depositors. Copies of the borrower’s financial statement are to be provided to the agent who will distribute them to each depositor (para 6.04). The borrower’s books and records are open to inspection and copying by any representative of the agent (para 6.08). The borrower is to give notice to the agent of any event involving a substantial claim against it or which might give rise to acceleration (para 6.12). It is not to merge or consolidate with any other company or dispose of any significant portion of its assets without the written consent of the agent (para 6.13). No prepayment or rescheduling of the debt is to be done without the prior written consent of the agent (para 6.14). Thus, it is quite clear that in virtually all aspects of the *578 relationship there is only one institution empowered to act on behalf of all the lending banks, and that is the Marine Midland Bank, N. A., as the duly designated agent for such banks.
Section 8 of the deposit agreement describes in considerable detail those circumstances which may constitute events of acceleration. The actual acceleration of the entire amount due does not occur, however, until the agent, “with the consent or at the direction of the Majority Depositors”, declares the entire amount due and payable (para 8.02 [a]). Thus, while the agent has the power to declare the entire amount due if an event of acceleration occurs, he also has the power to refrain from accelerating the entire amount unless otherwise directed by the majority depositors. No individual bank is given those rights.
Section 9 of the agreement governs the relationship of the agent, the manager and the depositors. Paragraph 9.01 provides: “Each Depositor hereby appoints the Agent to act as its Agent as herein specified and irrevocably authorizes the Agent to take such action on its behalf and to exercise such powers hereunder as are specifically delegated to the Agent in this Agreement and as are reasonably incidental thereto”.
Paragraph 9.02 provides: “The Agent will to the extent practicable under the circumstances consult with the Depositors prior to taking action on their behalf under this Agreement except for any action which it is required to take under this Agreement. The Agent will not take any action contrary to the written direction of the Depositors except for any action which it is required to take under this Agreement or by law and will take any lawful action in accordance with the provisions of this Agreement prescribed in a written direction of the Majority Depositors. The Agent may decline to take any action except upon the written direction of the Majority Depositors * * * the action of the Majority Depositors shall bind all the Depositors thereunder except in respect to matters specifically requiring consent of or action by all the Depositors”.
It is the responsibility of the agent to “distribute to each of the Depositors in like funds each Depositor’s pro rata share of all amounts of principal and interest and agreed share of other amounts received”. Indeed, to prevent any participating bank from obtaining an undue preference over another, if any depositor receives any payment other than to the agent, such individual depositor is deemed to have received such payment as agent for and on behalf of all the depositors.
It is apparent that the parties contemplated that there would be collective action taken by the agent on behalf of all members *579 of the consortium, or pursuant to the direction of the majority depositors. It would, indeed, be chaotic if each participating bank were to take separate action. When parties have agreed to operate through an agent or as a collective entity, whether it be a corporation, a partnership, a syndicate or a consortium, a unitary body is created, and only unitary action can be permitted. The parties herein were seeking to resolve in advance not only the possibilities of competing choice of forum and of governing law, but also to prevent the possibility of a multiplicity of suits by individual banks working at cross purposes for their own individual benefit.
The court on the prior attachment motion found the right of individual action in the provisions of paragraph 10.03. It provides: “The failure or delay of the Agent, the Manager or the Depositors to require performance by [defendant] or to enforce their rights under any provision of this Agreement or the Certificates of Deposit shall not affect their right to require performance and to enforce their rights with respect to such provision unless and until such performance has been waived in writing. Any waiver of an Event of Acceleration shall be effective only in accordance with its terms and may be restricted or contained in any way. No waiver of any Event of Acceleration shall constitute a waiver of a continuance or recurrence of such Event of Acceleration or of any other Event of Acceleration, except as specifically provided in such waiver. The rights granted to the Agent, the Manager or the Depositors hereunder, under the Certificate of Deposit or under any other document or instrument delivered hereunder and any rights available to them at law or in equity shall be cumulative and may be exercised in part or in whole from time to time.”
I must respectfully disagree with the conclusion of the court on the attachment motion that this provision “clearly allows plaintiff to maintain this action even in the absence of other member banks”. The provision deals with cumulative rights and waiver, and the whole purpose and purport of the paragraph is to specify that the failure or delay by the agent or depositors in enforcing their rights is not to be considered a waiver of their rights to require performance as against the borrower. The fact that the rights granted in that paragraph are declared to be cumulative merely assures the parties that the election of one remedy does not preclude another. There is nothing in that paragraph which would justify any departure from the over-all scheme which is, with certain specified exceptions, to have the agent act for the benefit of the entire consortium, rather than *580 having each of the nine member banks competing and conflicting with one another.
Plaintiff also points to paragraph 10.07, which is the consent to the jurisdiction of New York City or Caracas courts “as the Agent, the Manager or any Depositor may elect”. It further provides that the prescribed details as to how the defendant shall be served through a designated agent to receive process “shall not limit the right of the Agent, the Manager or the Depositors to serve process in any other manner permitted by Law or to bring any legal action or proceeding or to obtain execution of judgment in any jurisdiction.” That is not a blanket authorization for each individual depositor to proceed on its own. It means merely that the agent, the manager or the depositors (collective plural) are not limited by the paragraph to serving process on the C. T. Corporation System at 277 Park Avenue as agent to receive service on behalf of the defendant. The provisions that suit can be brought in New York City or Caracas as the agent, the manager or “any Depositor” may elect, must be read in the light of the entire agreement, which restricts the circumstances in which “any Depositor” can proceed on its own.
When an individual depositor bank is given the right to proceed independently and directly against the defendant, the agreement expressly so provides. For example, in paragraph 3.06, it is provided that if the defendant makes payment in a currency other than dollars which does not satisfy the dollar amount due, each depositor shall be entitled to demand payment and shall have a separate cause of action for the dollar deficiency. Such a provision, specifying the circumstances under which each depositor is entitled to a separate cause of action, solely with respect to dollar value of foreign currency payments, would not be necessary if each individual depositor could pursue its cause of action for any claims or defaults of whatever nature.
In that light it can be seen that provisions like paragraph 10.07 do not constitute an authorization for individual action, but specify what can be done about jurisdiction and service in those particular circumstances where the individual banks are authorized by other provisions to bring a separate legal action. Apart from such circumstances, departure from unitary or collective action can take place only when an individual bank has been authorized to proceed by a majority of the depositors, or where judgment has already been obtained and an individual bank is seeking postjudgment remedies.
The agreement must be read as a whole, and the isolation of one part taken out of context must not be permitted to pervert *581 the over-all contractual scheme. It is clear that the agreement calls for collective enforcement in the event of default, and that the over-all design of the agreement is to have unified action handled by a single agent who will proceed for all, so that no individual lending bank would gain a preference over the others. It would frustrate the agreement entirely if some of the constituent banks were agreeable to extending terms of payment, while a minority was insisting on literal and timely adherence. Thus, for example, paragraph 9.06 provides that in the event that any bank receives payment other than through the agent, such bank “shall be deemed to have received such payment as agent for and on behalf of all the Depositors.”
The dangers and disadvantages of individual action are highlighted by the facts in this case. The financial decrees of the Venezuelan government, promulgated in the light of a currency crisis, forbid the payment in dollars of the debt principal, while permitting continuing interest payments. A majority of the constituent banks and the depositors evidently have agreed to go along with the situation and not insist on precipitating a crisis. Only one bank, the plaintiff, holding 12% of the entire obligation, is insisting on immediate payment.
Plaintiff invited the other banks to join with it in bringing this action. None have done so. Instead, they have agreed to forbear, in order not to drive the defendant into insolvency. Plaintiff thereupon chose to bring suit unilaterally. If it is permitted to do so, the other banks would be required, as a matter of self-protection, to bring their own lawsuits, confronting the defendant with disparate and mutually antagonistic claims and making impossible an orderly approach to the refinancing of the debt. The majority of the banks of the consortium could properly consider that such action might jeopardize their chances for ultimate repayment in full. That is what the agreement tries to avoid. The nine members of the consortium, like the famous Three Musketeers, must stand “all for one, and one for all.”
The consortium by the lending banks to advance money to the defendant, limited in amount and in time, may properly be construed as a joint venture. A joint venture is a special combination of two or more parties for their mutual benefit and profit in a particular transaction, unlike the joinder for the general conduct of a particular line of business with the sharing of profits and losses and the joint and several liability which characterizes a partnership. (Forman v Lumm, 214 App Div 579; Hanlon v Melfi, 102 Misc 2d 170, 173.) In each case, the rights, *582 duties and obligations of the participants are governed by the contract between them. Otherwise, the general rule as to rights and duties is analogous to a partnership. (Hardin v Robinson, 178 App Div 724, 729, affd 223 NY 651; Haxton & Son v Rich, 267 App Div 492, 495; Napoli v Domnitch, 34 Misc 2d 237, mod, on other grounds 18 AD2d 707, affd 14 NY2d 508.)
It is axiomatic in partnership law that “[a] member of a partnership seeking to recover from a third party a debt due the partnership must bring the action on behalf of and for the benefit of the partnership and may not recover upon such an obligation individually. The cause of action resides in the partnership and not in one of its members.” (Kirschbaum v Merchants Bank, 272 App Div 336-337.) When an agent is designated to act on behalf of the joint venture, its role is analogous to that of a general partner in a limited partnership. New York law denies status to an individual contributor as a proper party to proceedings by or against a partnership vis-á-vis third parties, unless the action is brought on behalf of the entire partnership. (NY Partnership Law §§ 115, 115-a; see, Stevens v St. Joseph’s Hosp., 52 AD2d 722.) The standing to sue of an individual member of a banking consortium, particularly in the light of the agreement all members subscribed to, should be treated no differently.
This court unquestionably is the jurisdiction to deal with controversies arising out of the deposit agreement, but its construction of that deposit agreement leads it to conclude that at this juncture a proper lawsuit in New York against defendant for alleged default under the agreement can be brought only by the agent or as authorized by a majority of the banks in the consortium. Plaintiff bank, as an individual member of that consortium, has no standing to bring an action solely on its own behalf, contrary to the terms and the spirit of the agreement to which it subscribed.
In the light of the court’s conclusion as to the plaintiff bank’s lack of standing to sue individually, this court cannot deal at this time with considerations of whether timely performance by defendant of its obligation to pay is excused by “impossibility of performance” by reason of governmental intervention, and similarly it need not deal with the questions of comity and the effect of the Venezuelan financial decrees.
Accordingly, plaintiff’s motion for summary judgment is denied, defendant’s cross motion to dismiss on grounds of forum *583 non conveniens is denied, but the defendant’s cross motion to dismiss the action because plaintiff is not a proper party and has no standing to sue individually is granted.