OPINION OF THE COURT
Edward J. Greenfield, J.
This special proceeding presents a clash between two sovereigns, the State of New York and the Government of the United States, as to which is entitled to the unclaimed Federal income tax refunds of New York State residents. The Federal Government, denying the right of the State to such moneys, invokes the doctrine of sovereign immunity, while the State relies on its sovereign right of escheat. The controversy presents issues with significant and farreaching implications for future relations between the Federal Government and the States under our unique system of dual sovereignty.
THE CLAIM OF ESCHEAT
Under feudal law, the lord, upon termination of his tenant’s tenure of land by reason of treason, banishment, forfeiture, or want of heirs, was presumed to resume his original title to the land by way of escheat. All lands were deemed to be held by the subject either from his mesne lord, or from the king as lord paramount. All held property from the sovereign, either immediately or mediately. (1 Pollock & Maitland, History of English Law, at 232-240, 351 [2d ed]; Kavanaugh v Cohoes Power & Light Corp., 114 Misc 590, 612-613.) The meaning of escheat has been broadened to include property of every kind and description falling to the sovereign power for want of individual ownership, and the several sovereign States have succeeded to the rights of the king and feudal lords. (Matter of Clark, 271 App Div 691; Matter of People [Melrose Ave.], 234 NY 48.) As Judge Cardozo declared in the latter case: "Es-cheat to-day is not the privilege of one, but the collective right of all when the individual right has failed.” (Supra, at 53.)
Escheat survives today, not merely as a feudal relic, but because ownership abhors a vacuum. Someone must be deemed to have a legitimate claim to ownership of any property, real or personal. "[A]ll rights of property, of whatever nature they may be, revert to the People when the owner dies intestate” (Johnston v Spicer, 107 NY 185, 196-197 [1887], citing 4 Kent’s Commentaries, at 425 to the effect that: " 'if the ownership becomes vacant, the right must necessarily subside into the whole community’ ”.) Escheat was embodied *844 in the State Constitution (NY Const of 1894, art I, § 10, repealed by amendment Nov. 6, 1962), and its consequences spelled out and codified in the Abandoned Property Law (L 1943, ch 697), the declared policy of which, without surrendering any of the sovereign’s rights as to escheat, changed the emphasis from confiscation to custodial protection "for the benefit of all the people of the state”. (Abandoned Property Law § 102; Matter of Menschefrend, 283 App Div 463, affd 8 NY2d 1093, cert denied sub nom. Brown v Lefkowitz, 365 US 842.)
The statute was expanded in 1969 by the addition of a new article XII-A: "Unclaimed Or Abandoned Property In The Possession, Custody Or Control Of The United States Of America” (L 1969, ch 581). Section 1213 provides: "It is the purpose of this article to extend the declared policy of the state with respect to unclaimed or abandoned property to all such property in the possession, custody or control of the United States of America, its officers, agencies, departments, instrumentalities and corporations * * * This article provides for the escheat of all unclaimed or abandoned property, of whatever kind or nature, in the possession, custody or control of all other federal authorities, bodies or corporations and shall be liberally construed to accomplish such purpose.”
Section 1214 defines "property” to include "rights to claim refunds * * * and any thing of value of any nature whatsoever.” Section 1215 provides that: "If the rightful owner of any property in the possession, custody or control of the United States either (a) shall have been or shall be unknown for seven consecutive years; or (b) shall have died or shall die * * * without leaving * * * distributees; or (c) shall have abandoned or shall abandon such property” and "such property is owed or came into being as the result of returns filed or other transactions occurring in this state”, then such property is to escheat to the State or New York. Section 1217 empowers the State Attorney-General to institute special proceedings in the State Supreme Court to recover such property.
THE PROCEEDINGS
Believing the United States Government to be holding substantial amounts of income tax refunds to which residents of this State were entitled, such as refund checks which were returned undelivered or were never cashed with more than seven years having elapsed, the Attorney-General of the State of New York commenced this proceeding seeking an order or *845 judgment that such refunds should now escheat to the People of the State of New York pursuant to the Abandoned Property-Law.
In accordance with section 1220 (c) thereof, the Secretary of the Treasury of the United States was served as the officer having possession, custody or control of the property, the statute making it explicit "that no personal claim is made against him”. The court then designated a guardian ad litem to protect the rights and interests of all persons, their heirs, next of kin and distributees whose last known addresses were within the State but whose present whereabouts were unknown. An order of publication was required pursuant to Abandoned Property Law §§ 1206 and 1220 for the class of respondents whose whereabouts were unknown to give notice that the State was claiming an escheat of any tax refunds due them which were now deemed abandoned.
Rather than answer the petition and contest the matter in this court, a notice of removal was filed, bringing the matter before the United States District Court for the Southern District of New York. The Secretary of the Treasury then moved to dismiss the proceeding on grounds of sovereign immunity, and the State of New York cross-moved to remand the matter back to this court on the grounds that Federal jurisdiction was lacking.
The Hon. Richard M. Owen, in a brief memorandum opinion, granted the motion to remand. He held there was no Federal jurisdiction, the Secretary of the Treasury being no more than a stakeholder, with no claim of right to the funds in question. He therefore found the question of the right of escheat was one to be resolved by the State court, presumably as a matter of State law.
In this court the Secretary of the Treasury again moves to dismiss the petition as a matter of law. He contends:
(1) This court lacks subject matter jurisdiction over the Secretary of the Treasury, who is cloaked with sovereign immunity.
(2) The moneys held as potential tax refunds are not segregated trust funds, and until paid over remain money of the United States.
(3) This court cannot, by requiring turnover to the State of unclaimed tax refunds, impose an administrative burden on the internal operations of the Federal Government which *846 would require the expenditure of public funds from the Treasury.
(4) The State has failed to comply with the procedural prerequisites of one claiming entitlement to a tax refund and the Federal Government could therefore be subject to possible double payment by claimants whose refunds have been es-cheated.
SOVEREIGN IMMUNITY
It is basic law that the United States, as sovereign, may not be sued without its consent. (United States v Mitchell, 445 US 535, 538 [1980]; United States v Testan, 424 US 393, 399 [1976].) Moreover, a waiver of sovereign immunity cannot be implied, but must be unequivocally expressed (United States v King, 395 US 1, 4 [1969]; Brown v General Servs. Admin., 507 F2d 1300, 1307 [2d Cir 1974], affd 425 US 820 [1976]). In the absence of clear congressional consent permitting suit in certain classes of cases, there is no jurisdiction in this or any other court to entertain a suit against the United States. (United States v Sherwood, 312 US 584, 587 [1941].) "The exemption of the United States from being sued without its consent extends to a suit by a State.” (Minnesota v United States, 305 US 382, 387 [1939].)
Respondent cites Minnesota v United States (supra, at 386) for the proposition that: "A proceeding against property in which the United States has an interest is a suit against the United States.” (See also, In re Escheat of Monies Deposited in U. S. Dist. CL, 187 F2d 131, 135 [3d Cir 1951].) Such citations define the issue, but they do not resolve the question. Does the United States "have an interest” in the unclaimed tax refunds, or is it, as Judge Owen held, a mere stakeholder?
LAW OF THE CASE
In opposition to the Secretary’s motion to dismiss the petition, the petitioner urges that Judge Owen’s decision is the law of the case and that the respondents are merely stakeholders. The rule as to the law of the case calls upon a court to recognize that once an issue has been litigated and decided in a court of coordinate jurisdiction, that should be the end of the matter until passed upon by an appellate court. (United States v U. S. Smelting Ref. & Min. Co., 339 US 186 [1950], reh denied 339 US 972; Matter of Dondi v Jones, 40 NY2d 8 [1976]; Martin v City of Cohoes, 37 NY2d 162, 165.) As this *847 court has previously observed, what we call the law of the case "is the pragmatic result of two salutary principles. They are that matters once litigated should not be endlessly relitigated, and that a Judge handling a subsequent aspect of a case should not, in disagreement with a prior ruling by a colleague, sit in appellate review of a Judge of concurrent jurisdiction.” (Pugatch v David’s Jewelers, 53 Misc 2d 327, 328.) "Of course”, it was added, "a Judge passing on the earlier stages of a case owes a reciprocal duty to those who come after him to decide no more than what is essential for disposition of the issue before him” (supra, at 328).
"However, care must be made to distinguish between judicial utterances and judicial determinations.” (Credit Francais Intl. v Sociedad Financiera De Comercio, 128 Misc 2d 564, 575.) Where a Judge has made a judicial comment in passing on an application for a provisional remedy, or has made some other threshold ruling, what is binding on the subsequent Judge is what has been "judicially determined”, and not necessarily the reasoning used to arrive at the result. (Supra; see also, Animalfeeds Intl. v Banco Espirito Santo, 101 Misc 2d 379, 382-383.) In this case, what Judge Owen decided is that the State court, and not the Federal court, should retain jurisdiction. In so doing, he necessarily decided that the United States was amenable to suit brought by the State in this court. Nevertheless, it has been pointed out that his decision was not subject to appeal. (28 USC § 1447 [d]; Thermtron Prods. v Hermansdorfer, 423 US 336 [1976].) Hence, whether or not, as contended, his decision was "ill-considered, made on the basis of an incomplete record, or was in error”, this court will make its own independent determination as to whether it has subject matter jurisdiction with respect to unclaimed Federal tax refunds.
FEDERAL ESCHEAT
It is important to begin an analysis of respondents’ claim of interest in the tax refunds by noting that the Secretary of the Treasury does not claim a right to escheat the tax refunds in the Federal Treasury. The reason for this omission can be stated briefly:
There is no Federal right of escheat. As the prerogative of the sovereign, that right was assumed by each individual State which became sovereign on the Declaration of Independence of 1776. The Constitution of 1789 which created the *848 Government of the United States gave the Federal Government only those powers deemed necessary for effective action on its part, and the 10th Amendment expressly reserved to the States those powers not expressly delegated. The right of escheat, which had passed from the king to the States, does not entitle the Federal Government to resorb abandoned property which happens to be in its hands. "There is never a permanent escheat to the United States.” (Hodgson v Wheaton Glass Co., 446 F2d 527, 535.)
To state that there is no Federal right of escheat or to recognize that the power to determine the right of succession has been historically vested in the States does not entirely resolve the issue presented, for it is possible that pursuant to US Constitution article VI (Supremacy Clause) the Federal Government may act to defeat State escheat statutes (see, United States v Burnison, 339 US 87 [1950]; see also, in particular, the dissenting opn of Mr. Justice Douglas in United States v Oregon, 366 US 643 [1961], and the cases cited therein).
United States v Oregon (supra) is a clear example of the resolution of competing claims by two sovereigns over escheat funds. There the State of Oregon claimed personal property of a deceased veteran dying in a veteran’s hospital pursuant to its escheat statute. A Federal statute, however, provided that personal property of a veteran dying in a V.A. hospital without heirs or a will "shall immediately vest” and become the property of the United States in trust for the benefit of veterans similarly situated.
The Supreme Court upheld the constitutionality of the Federal statute under the "necessary and proper” clause of the Federal Government’s power to raise armies and provide for the welfare of veterans. United States v Oregon (supra) establishes the right of the Federal Government to act affirmatively to defeat State escheat statutes in specified circumstances.
Respondents, however, do not allege that the Federal Government has acted affirmatively to prevent the escheat of Federal tax refunds.
Where Congress has intended to prevent escheat of funds held in a Treasury account, it has enacted explicit legislation to do so, e.g., with respect to unclaimed bankruptcy dividends (Pub L 868 [Aug. 1, 1956], HR Doc No. 6247, subsequently repealed, Pub L 95-598) or with respect to unclaimed deposits *849 in the postal system (Pub L 92-117; 85 Stat 337; 31 USC § 1322).
This last statute as enacted by the 92nd Congress and its legislative history is interesting not only because of the similarity to the facts here, but for what it reveals about respondents’ claim of sovereign immunity.
Public Law 92-117 authorized the Secretary of the Treasury to retain a portion of unclaimed deposits in the postal savings system "without regard to any laws of the States or other jurisdictions of deposit concerning the disposition of unclaimed or abandoned property.” It also provided for distribution of the millions of dollars remaining among the States according to the percentage of contributions made within each State in order to provide a more equitable method of distributing these funds "than may be accomplished under differing [state] es-cheat laws.”
The legislative history of that statute reveals that Treasury Regulations were promulgated in 1969 to: "specifically provide for the recognition of a State court judgment of escheat to a State government where applicable State law exists of unclaimed deposits in inactive accounts. These regulations issued from the Treasury following legal action taken by several States in 1968 for custody of deposits in inactive postal savings accounts” (1971 USC Cong & Admin News, at 1399).
It is implicit from the foregoing that the respondent has in the past recognized the validity of State court judgments escheating sums held in the Federal Treasury. Why the Secretary of the Treasury now seeks to assert the defense of sovereign immunity is not clear and the issue has not been addressed by respondents.
UNITED STATES AS STAKEHOLDER
If, as the State contends, and Judge Owen concluded, the Secretary of the Treasury is a mere stakeholder, and the United States Government no longer has title, or a legitimate claim to ownership of tax refunds already declared to be due and owing to the taxpayer, then the United States is not really a contesting party, but is a nominal party only, and its immunity from suit without its consent is not in issue. (United States v Klein, 303 US 276 [1938].) In the Klein case, the Commonwealth of Pennsylvania claimed an escheat of funds being held by a United States District Court as unclaimed bankruptcy dividends. The United States Supreme Court re *850 jected the Government’s claims of sovereign immunity "[s]ince the Government has not set up and does not assert any claim or interest in the fund apart from the possession” (supra, at 282).
Similarly, in Application of Commonwealth of Massachusetts (206 F Supp 106, 109 [US Dist Ct, Mass 1962]), the holding of unclaimed funds by the Federal Treasury was held not to bar a claim for escheat, because "the United States has no beneficial interest therein but holds the money * * * for the rightful owners when and if they are determined.” Certainly, if the individual claimants sought to assert their rights to moneys already declared to be rightfully theirs, the Government could not resist by insisting on its immunity from suit. The State, in asserting the right of escheat, stands in the shoes of the rightful claimants, and is entitled to reclaim the funds as abandoned property. "The state as the ultimate owner is in effect the ultimate heir” (Matter of People [Melrose Ave.], 234 NY 48, 51, supra).
Bear in mind that we are not dealing here with a class action brought by a State on behalf of a group of its citizens to establish a right under given circumstances to entitlement to a tax refund. The question of entitlement has already been decided. Certain individuals clearly have overpaid. The United States is not contesting, but has conceded that fact. The right to the refunds has been established. Payment would have been made but for the fact that the persons entitled cannot be located, more than seven years have elapsed, and under those circumstances, the money being held in their name may be deemed abandoned, and subject to escheat under State law.
There are numerous cases where States have proceeded to assert claims of escheat of funds held custodially by an agency of the United States. Thus, in Anderson Natl. Bank v Luckett (321 US 233, 248), where the State of Kentucky sought to invoke an escheat statute despite a Federal claim of unconstitutional interference with its supervision over national banks, the court declared: "The statute here attacked does not purport to do more than does any other regulation of the devolution of bank accounts of missing persons, a function which is, as we have seen, within the competence of the state. Under the statute the state merely acquires the right to demand payment of the accounts in the place of the depositors.”
Nevertheless respondent contends that it is not a mere stakeholder, but that it has an interest in the tax refunds *851 because it has possession of the money, and that money in the possession of the United States "remains the money of the United States until paid over to the person entitled to it.” (Brockelman v Brockelman, 478 F Supp 141, 144 [US Dist Ct, Kan 1979.) The case cited involved an attempt by creditors (not a sovereign State) to garnish income tax refunds allegedly due to debtors. There, of course, the question of who was entitled to the money was very vigorously contested. But here entitlement has been determined, and the funds are held custodially by the United States pending transfer to the beneficial owner. Hence, cases cited by respondent such as Hawaii v Gordon (373 US 57 [1963]), Dugan v Rank (372 US 609 [1963]) and Larson v Domestic & Foreign Corp. (337 US 682 [1949]), where the United States claimed title to the property in issue, are inapposite. When the United States is a mere stakeholder, a State can make the definitive determination as to the devolution of title. (Stapleton v $2,438,110, 454 F2d 1210, 1214 [3d Cir 1972].)
FINALITY OF THE TAX REFUND DETERMINATION
Respondent alternatively argues that if the State indeed does stand in the shoes of the missing taxpayers, it has no greater rights than they would have, and hence even at this stage the right to a refund has not been finally determined. It contends that any taxpayer seeking a refund would have to identify himself, and establish that he remains entitled to the refund. If the claim were then denied, he could then file suit under 28 USC § 1346 (a) (1), which expressly provides the Government’s consent to be sued. A State seeking escheat of abandoned claims need not itself file a claim for refund with the Internal Revenue Service — such a claim has already been determined. The contention that the Government may have a subsequently arising offset against the refund is highly suppositious. We are dealing with refunds on the books for more than seven years. If there are in fact any offsets, they can be handled administratively on an individual basis, and would not bar an adjudication of title.
The argument that the Government might be subject to double liability in having to pay over a refund to the taxpayer after it has turned over the money to the State is singularly unpersuasive. The Statute of Limitations for income tax refunds is in most cases three years, and in a very limited category seven years from the date prescribed by law for filing *852 a return (see, 26 USC § 6511). Since a refund is generally computed and a check sent out sometime after taxes are paid or due, the probability of a taxpayer appearing after seven years and claiming a refund is remote. The Abandoned Property Law provides for the contingency that a long-lost owner might appear and claim what had been deemed to be abandoned property (see, e.g., Abandoned Property Law § 1406), and in that event petitioner has stipulated that it will refund such moneys to respondent. Indeed the law requires that the State relieve and hold harmless any party from which it has received ostensible abandoned property. (Abandoned Property Law § 1404 [2].)
ADMINISTRATIVE DIFFICULTIES AND EXPENSES
As a corollary to its argument on sovereign immunity, the Secretary of the Treasury contends that this proceeding is barred because this court cannot enter an order which would interfere with public administration or expend itself on the public Treasury.
Affidavits have been submitted detailing the extraordinary amount of man-hours that would be required to determine the amount of money due the State pursuant to the escheat statute. With regard to records prior to 1963, when the Internal Revenue Service began computerized operations, the task would allegedly involve review of millions of pieces of paper. The cost for this work cannot be estimated, but the statement is made that it would cost millions of dollars.
Respondents contend that what petitioner seeks is not a declaration of its rights, but in essence an order compelling the Federal Government to examine all its tax records at respondents’ expense, so that a specified sum can be determined which would be subject to escheat.
In this regard it must be noted that the State has not made clear how far back it would like to go in asserting its claim for abandoned tax refunds.
Theoretically, the escheat sought might include all tax refunds due New York citizens since the enactment of the Civil War Tax Acts, in particular the act of July 1, 1862 under which the first income tax was collected (see, US Rev Stat tit 35 [1873]), or at least since the 1913 enactment of the 16th Amendment.
If the " 'essential nature and effect of the proceeding’ [is] such as to make plain that the judgment sought would expend *853 itself on the public treasury or domain, or interfere with the public administration * * * [it is a] suit * * * against the sovereign” and barred by sovereign immunity. (Land v Dollar, 330 US 731, 738.)
However, there is also some evidence that the IRS does keep a list of unclaimed tax refunds by State of last residence and that those lists have been regularly published in the New York Times.
If these lists do exist, turning them over to petitioner does not constitute an intrusive or burdensome interference with the necessary functions of the Federal Government so as to bar this action on grounds of sovereign immunity. (United States v Briggs, 514 F2d 794 [5th Cir 1975]; Leopold v United States Civ. Serv. Commn., 450 F Supp 154 [US Dist Ct, ED NY 1978].) "It would not seem too much to ask that a federal officer, possessed of property claimed by the State to be subject to its taxing or escheat power, make reasonable disclosure thereof to such authority as the State designates. It is but a decent comity between governments.” (Roth v Delano, 338 US 226, 230 [1949].)
Whether these lists do exist for any particular years and whether respondent can prevent petitioner from obtaining these lists under the Freedom of Information Act, has only been tangentially referred to by the parties and is properly the subject of a discovery motion.
The simple answer on this motion to dismiss the petition as a matter of law, is that the practical and pragmatic difficulties which might ensue, including whatever expenditure of funds may be entailed, are factual considerations which cannot at the outset stand as a bar to the State’s seeking to assert its rights.
To avoid the practical difficulties the Federal Government poses a limited order can be crafted, or the State and Federal Governments, the principle having been established, can work out a reasonable modus operandi in which each might yield some rights of which they are theoretically entitled. An agreement settling past claims for a stipulated sum, and setting up a computerized method to earmark and segregate abandoned tax refunds for the future would be a practical and administratively inexpensive solution.
Respondent’s further argument that because the sums involved may be potentially enormous, the State is barred from recovery, while if the amounts were trivial a different result *854 might ensue, need not long detain us. We are not about to stand an old maxim on its head and declare: "De maximus non curat lex. ”
The motion to dismiss the petition is denied in all respects. Respondent is directed to answer the petition within 30 days of service of this order.