OPINION OF THE COURT
Titone, J.
 Federal tax refunds that are owed but have remained unclaimed have traditionally been held for the taxpayer in the general fund of the United States Treasury. In this proceeding, the New York State Attorney-General seeks to *744 recover from the United States Government those unclaimed refunds which, he alleges, have escheated or will escheat to the State by operation of article XII-A of the Abandoned Property Law. The focus of this appeal in what has become a protracted and complex intergovernmental litigation is the constitutionality and effect of a statute recently enacted by Congress that, by its terms, would nullify New York’s statutory right of escheat with respect to citizens’ unclaimed income tax refunds. We now conclude that the challenged Federal law was within Congress’s constitutional powers and that Congress’s evident intention broadly to override the States’ rights of escheat without reservation ought to be given full effect.
The doctrine of escheat has its origin in feudal notions of real property rights, which were deemed to derive, directly or indirectly, from the king or the mesne lord (see, 1 Pollock & Maitland, History of English Law, at 232-240, 351 [2d ed]; Note, Origins and Development of Modern Escheat [hereinafter Modern Escheat], 61 Colum L Rev 1319). In the United States, the reversionary rights of the sovereign have devolved upon the States rather than the Federal Government, and each of the 50 States has enacted specific legislation implementing the common-law doctrine of escheat (see, Hodgson v Wheaton Glass Co., 446 F2d 527, 535; Modern Escheat, op. cit., at 1327 [and authorities cited therein]). In New York, the State’s escheat rights were initially embodied in the State Constitution (see, NY Const of 1894, art I, § 10, repealed by amendment Nov. 6, 1962). However, they are now codified in the Abandoned Property Law (L 1943, ch 697).[1]
Enacted in 1969 (L 1969, ch 581), article XII-A of the Abandoned Property Law now "extend[s] the declared policy of the state with respect to unclaimed or abandoned property to all such property in the possession, custody or control of the *745 United States of America.” Under Abandoned Property Law § 1215, property held by the United States escheats to the State of New York if "the rightful owner * * * shall have been * * * unknown for seven consecutive years * * * or * * * shall have abandoned * * * such property, and either * * * the last known address of such rightful owner, as it appears from the records of the United States is in this state” or certain other conditions establishing substantial contact with the State are satisfied. Such property, if unclaimed by the rightful owner for seven consecutive years, is presumed abandoned and escheats by operation of law (Abandoned Property Law § 1216).
In 1980, in an effort to bring some of the unclaimed funds held in the United States Treasury within the State’s control pursuant to article XII-A, the New York State Attorney-General commenced the present proceeding against the Secretary of the Treasury, alleging that New York’s right of escheat entitled it to the proceeds of some of its citizens’ unclaimed income tax refunds. Specifically, the Attorney-General sought to recover on behalf of the State the amounts represented by undeliverable and uncashed refund checks held by the United States for New York residents for more than seven years.
The litigation proceeded through a number of early skirmishes, including unsuccessful efforts by respondent to remove the case to Federal court (see, In re Petition of Abrams, 80 Civ 718, US Dist Ct, SD NY, Oct. 21, 1980) and to secure a dismissal on grounds of sovereign immunity (see, Matter of Abrams v Miller, 134 Misc 2d 841). Following the latter judicial loss, Congress intervened by enacting the Omnibus Budget Reconciliation Act of 1987 (Pub L 100-203 [the Omnibus Act]), the statute challenged here. The Omnibus Act, which is codified at 26 USC § 6408 and took effect on December 22, 1987, provides, in pertinent part, that "[n]o overpayment of any tax * * * shall be refunded (and no interest with respect to any such overpayment shall be paid) if the amount of such refund (or interest) would escheat to a State or would otherwise become the property of a State under any law relating to the disposition of unclaimed or abandoned property.”
Relying on this new statute, respondent again moved to dismiss the Attorney-General’s petition oh the ground that the State’s escheat rights to unclaimed tax refunds under its Abandoned Property Law had now been overridden. In re *746 sponse, the Attorney-General argued that the Omnibus Act was unconstitutional because it was not a "necessary and proper” exercise of Congress’s taxing power. Alternatively, he argued that, even if constitutional, the statute should not be applied "retroactively” so as to defeat New York’s right to claim funds that had escheated before its effective date. By interim order dated July 25, 1988,..the trial court converted respondents’ motion to dismiss to one for summary judgment.
On the merits, the trial court held that it could not "substitute its judgment for that of the Congress in determining whether the law is a necessary and proper exercise of its undisputed powers to enforce the Internal Revenue Code and * * * to administer undeliverable refunds.” (Matter of Abrams v Baker, 141 Misc 2d 882, 887.) Thus, in the court’s view, there was no legal basis for invalidating the Omnibus Act as an ultra vires congressional enactment. With respect to the Attorney-General’s alternative argument, however, the court ruled that partial relief should be afforded to the State. Reasoning that the Act "cannot operate retroactively to cut off any matured substantive rights,” the court held that, pursuant to the self-executing escheat provisions contained in Abandoned Property Law § 1223, the State was entitled to "any tax refunds held by respondent, which would otherwise be subject to escheat under article XII-A * * * to which the rightful owner has not made claim for seven years prior to [the Omnibus Act’s] effective date” (141 Misc 2d, at 888-889, supra).
On cross appeals by both parties, the Appellate Division agreed that the Omnibus Act was a valid exercise of congressional authority, but concluded that the trial court’s holding on the retroactivity question was in error. Taking note of the general rule that requires courts to apply the substantive law in effect at the time their decisions are rendered (citing United States v Schooner Peggy, 1 Cranch [5 US] 103), the court utilized the Federal three-factor analysis for determining whether "retroactive” application of the new statutory rule should be forbidden here (see, Bradley v Richmond School Bd., 416 US 696; Chevron Oil Co. v Huson, 404 US 97). Since the "step-by-step analysis” set forth in the Federal case law did not suggest otherwise, the Appellate Division held that the Omnibus Act could be applied "retroactively” to preclude all recovery by the State. On the Attorney-General’s appeal from the Appellate Division’s order, we now affirm.
Although the Federal Government does not itself possess a *747 generally applicable right of escheat analogous to that possessed by the States, it is well established that the Government can override the States’ escheat rights through affirmative legislation and that the Tenth Amendment, which reserves certain spheres of power to the States (US Const 10th Amend), does not operate as an impediment to Congress’s authority in this area (see, United States v Oregon, 366 US 643; see also, Garcia v San Antonio Metro. Tr. Auth., 469 US 528). Indeed, Congress has previously enacted laws designed to defeat certain specific escheat powers possessed by the States (see, e.g., Pub L No. 868, ch 819, 70 US Stat 785 [1956], repealed by Pub L 95-598 [unclaimed bankruptcy dividends]; Pub L 92-117, codified at 31 USC § 1322 [unclaimed deposits in Postal Savings System]), and the Attorney-General does not here dispute Congress’s power to do so, at least in principle. Instead, the Attorney-General contends, the particular enactment he challenges, which purports to affect the States’ rights with respect to unclaimed tax refunds, is impermissible because it is not a "necessary and proper” incident to the exercise of a power that has expressly been given to the Federal Government, i.e., the power to lay and collect income taxes. It is to this narrow contention that we now turn our attention.
The Attorney-General’s argument rests on the premise that the Federal Government has no interest in funds collected by its Internal Revenue Service once it determines that those funds represent overpayments that should be refunded to the individual taxpayers. Based on this assumption, the Attorney-General contends that the Omnibus Act bears no rational relationship to the power to impose an income tax that has been conferred on Congress by the Sixteenth Amendment (US Const 16th Amend) and that, accordingly, even the minimal level of scrutiny that is applied when considering the scope of Congress’s powers under the Necessary and Proper Clause (US Const, art I, § 8, cl 18) is unsatisfied (see, Legal Tender Case, 110 US 421, 440; Ex parte Curtis, 106 US 371, 372).
However, the fact that the Federal Government may have no revenue-based interest in the retained funds is not dispositive. The enumerated power to lay and collect taxes certainly includes, as a "necessary and proper” incident, the power to establish an administrative framework for the collection of taxes.
That an ongoing administrative interest does, in fact, exist *748 is apparent from even the most cursory examination of the system Congress has devised for the collection of income taxes. Since World War II, the complex task of collecting Federal income tax from each citizen has been facilitated by a system of payroll withholding, in which the taxpayer’s annual tax obligation is estimated and an appropriate amount deducted from his or her paycheck. This withholding system represents a congressional decision concerning the most effective method of assuring prompt payment and, as such, is not subject to judicial challenge (see, McCulloch v Maryland, 4 Wheat [17 US] 316, 421).
The need for a system of refunding overpayments is a natural corollary to a collection system based on withholding, since there will inevitably be instances in which the total amount of the taxpayer’s annual tax obligation has been overestimated and, consequently, a payment in excess of the amount due has been made. Manifestly, the method and manner of making these refunds are as much a congressional prerogative as are the method and manner of collecting citizens’ tax payments in the first instance. In both instances, Congress’s freedom to make choices is circumscribed only by the requirements that they be "conducive or adapted to the end to be accomplished” (Legal Tender Case, 110 US, at 440, supra) and that the end be "legitimate” as well as "within the scope of the constitution” (McCulloch v Maryland, supra, at 421).
The broad end to be served in this instance is the fair administration of a national system of income taxation, an end that is plainly within the scope of the constitutional power to "lay and collect” income taxes. The more immediate end to be served by the Government’s system of tax refunds, i.e., to preserve a Federally administered fund against which taxpayers or their heirs may claim refunds of their overpayments at any time, is also one that is plainly within the scope of the power to tax.
As the Attorney-General himself recognizes, Congress has long chosen to implement this goal through a policy of holding the proceeds of undeliverable or uncashed refund checks in trust for the benefit of the taxpayer indefinitely (see, Pub L No. 473, ch 756, 48 US Stat 1224 [1934], codified at 31 USC former § 725 [as amended periodically]; Pub L No. 171, ch 222, §§ 1, 2, 61 US Stat 308 [1947], codified at 31 USC former §§ 132, 133 [as amended periodically]; 31 USC §§ 1324, 3328 [a] *749 [as amended by Pub L 100-86, tit X, § 1002]). Thus, although it conceivably could have elected a number of other courses, Congress has opted for a system in which the taxpayer, or the taxpayer’s estate, will receive full credit for his or her overpayments, whenever a claim therefor is made.[2] The Omnibus Act, the statute at issue here, merely represents a further step to implement this policy by overriding the State escheat laws that would otherwise operate to defeat it. Indeed, this purpose is apparent from the legislative history of the Omnibus Act itself. The report issued by the House Conference Committee with regard to the statute states:
"Although under present law unclaimed Federal tax refunds remain in the General Fund of the Treasury, no provision of the Code expressly requires that such unclaimed refunds escheat (revert) to the Federal Government. Some States have sued the Federal Government, asserting that unclaimed Federal tax refunds escheat to the State. If the States win these cases, the Federal Government would be required to pay these amounts out of the General Fund of the Treasury”. (HR Conf Rep No. 100-495, 100th Cong, 1st Sess, at 1006, reprinted in 1987 US Code Cong & Admin News, at 2313-1752.)
Thus, the clear purpose of the Omnibus Act was to prevent the States from obtaining custody of the unclaimed refund moneys in the Federal Treasury. While the Attorney-General regards this purpose as "confiscatory” and impermissible, it is, in fact, nothing more than a congressional effort to avoid State interference with the Federal policy of preserving the taxpayer’s right to recover the unclaimed funds directly from the Government at any time.
*750 The Attorney-General’s claim that the Government cannot demonstrate any need related to the taxing system "to control the refund process on a permanent basis” is similarly unavailing. This aspect of the Attorney-General’s argument is flawed because it is, admittedly, based on the circular premise that "refunds which have been unclaimed for seven years lose any relationship they may have had to the administration of the tax system.” The premise is correct only to the extent that the taxpayers’ interests in the refund moneys, which the Government seeks to protect, are immutably defined and circumscribed by the State’s escheat laws. As we have previously noted, however, there is nothing in the Tenth Amendment, or in any other provision of the United States Constitution, that prevents the Federal Government from overriding the States’ escheat laws to effectuate congressional policies that are within the scope of Congress’s powers under the Necessary and Proper Clause. Since that is precisely what Congress has done here, it cannot be said that the unclaimed moneys the State seeks have lost their character as unpaid tax refunds belonging to citizens and no longer have any relationship to the administration of the Federal tax system.
Having concluded that Congress acted within the scope of its powers to administer the Federal income tax system when it enacted the Omnibus Act, we turn now to the question of whether that enactment cut off the State’s right to all of its citizens’ unclaimed refunds presently held in the United States Treasury or is instead limited in effect to those refunds that had not yet escheated at the time the statute became effective. On this question, we stress at the outset that the Attorney-General does not claim any constitutionally protected "vested” interest in any of the unclaimed funds (see, South Carolina v Katzenbach, 383 US 301, 323-324 [Fifth Amendment’s Due Process Clause does not protect States]; see also, South Carolina v Baker, 485 US 505). Rather, his argument focuses on Congress’s intentions and the propriety of what he characterizes as "retrospective” application of the statute in light of those intentions. However, the Attorney-General’s arguments on the question of retrospectivity do not withstand close analysis.
The Omnibus Act prohibits Federal authorities from refunding any overpayment of income tax if the payment would escheat to a State. Thus, the statute is, by its terms, directed at the future conduct of public officers, and no real question of retroactive effect on past conduct or events is *751 presented. Indeed, given the clarity of the simple legislative directive, there is no need to look beyond the well-established rule that a court should decide controversies on the basis of the substantive law as it exists at the time of the decision (e.g., United States v Schooner Peggy, 1 Cranch [5 US] 103, supra). Under that rule, the Attorney-General’s efforts to recover unclaimed tax refunds that he asserts have escheated to the State would have to fail because the Omnibus Act explicitly prohibits Federal officials from paying over such funds under these circumstances.
Furthermore, even if the language of the statute itself were less clear, the legislative history demonstrates beyond peradventure that application to all of the unclaimed refunds now held in the United States Treasury was precisely what Congress intended. As is evident from the House Report quoted above, Congress was concerned that moneys currently being held in the Treasury in trust for taxpayers would have to be paid out if the “States [that] have sued the Federal Government * * * asserting that unclaimed Federal tax refunds escheat to the State * * * win these cases” (HR Conf Rep No. 100-495, op. cit, at 2313-1752). The Omnibus Act was adopted specifically to obviate this result. And, since Congress’s intent with regard to the application of the statute is clear from both the language and the history of the statute, there is no need for us to consider whether application of the Omnibus Act to this case would result in "manifest injustice” (see, Bradley v Richmond School Bd., 416 US 696, supra; see also, Chevron Oil Co. v Huson, 404 US 97, supra).
In sum, the Omnibus Act, which operates to nullify the States’ formerly existing escheat rights to certain unclaimed income tax refunds was a permissible exercise of Congress’s powers under the Necessary and Proper Clause of the United States Constitution (US Const, art I, § 8, cl 18), since it implements Congress’s authority under the Sixteenth Amendment "to lay and collect” income taxes. Accordingly, under the Supremacy Clause of the Constitution, we are bound to recognize this Federal statute as a valid limitation on the escheat rights established by article XII-A of the Abandoned Property Law. Inasmuch as the statute does not, by its terms, admit of any exception for unclaimed refunds that may have already become subject to the State’s escheat laws, the Appellate Division was correct in concluding that the Attorney-General’s petition should have been dismissed in its entirety.
*752 Accordingly, the order of the Appellate Division should be affirmed, with costs.
Chief Judge Wachtler and Judges Simons, Kaye, Alexander, Hancock, Jr., and Bellacosa concur.
Order affirmed, with costs.

. The expressed policy of the State under the Abandoned Property Law is "to utilize escheated lands and unclaimed property for the benefit of all the people of the state” "while protecting the interest of the owners thereof’ (Abandoned Property Law § 102 [emphasis supplied]). Thus, the present law permits the true owner, upon a proper showing, to reclaim property that has been taken as abandoned by the State (see, Abandoned Property Law §§ 1404, 1406). This "marks a change from many existing provisions of law which escheat such property to the state and wipe out the rights of the owner * * * after a specified period of time” (Joint Statement by Senator Wicks and Assemblyman Moffat, issued Feb. 28, 1943, reprinted in McKinney’s Cons Laws of NY, Book 2 Vi, Abandoned Property Law § 102, Historical Note, at 2).

. Under the present system, the proceeds from undelivered refund checks are placed in a general fund account within the Treasury and the taxpayer’s "account” with the Internal Revenue Service is posted with a permanent credit. Where the refund check has been delivered but not cashed for more than a year, the check itself becomes invalid but the taxpayer retains a continuing right to claim payment from a special account for outstanding governmental obligations. Credits held in the taxpayer’s Internal Revenue Service account are held against the possibility that the taxpayer, or the taxpayer’s estate, will seek payment of the refund at some time in the future. Alternatively, the credit may be applied to offset certain of the taxpayer’s obligations, such as unpaid Federal tax or child support (see, 26 USC § 6402). In at least one instance, a tax refund was paid in the early 1980’s based upon a return that had been filed in the 1940’s.