In re ENRON CORP., et al., Debtors.

Mizuho Corporate Bank, Ltd., as successor to The Industrial Bank of Japan, Limited, and Banco Bilbao Vizcaya Argentaria S.A., Plaintiffs,

v.

Enron Corp., Hansen Investments Co. and Compagnie Papiers Stadacona, Defendants.

Bankruptcy No. 01 B 16034(AJG).
Adversary No. 03–2288A.

United States Bankruptcy Court, S.D. New York.

Dec. 17, 2003.

Weil, Gotshal & Manges LLP, Washington, DC, by David A. Hickerson, Esq., Peter M. Friedman, Esq., Melanie Gray, Esq., Martin A. Sosland, Esq., for the Debtors.

Stroock & Stroock & Lavan LLP, New York City, by Brian Cogan, Esq., Mark Speiser, Esq., Harold A. Olsen, Esq., for Mizuho Corporate Bank, Ltd.

Clifford, Chance, Rogers & Wells LLP, New York City, by Dennis J. Drebsky, Esq., for Banco Bilbao Vizcaya Argentaria, S.A.

Akin, Gump, Strauss, Hauer & Feld, LLP, New York City, by Robert Alan Johnson, Esq., for Goldman Sachs Credit Partners, L.P.

Squire, Sanders & Dempsey L.L.P., Cleveland, OH, by G. Christopher Meyer, Esq., for the Official Committee of Unsecured Creditors.

## MEMORANDUM DECISION AND ORDER CONCERNING (I) DEFENDANTS' MOTION TO DISMISS COMPLAINT, AND (II) PLAINTIFFS' MOTION TO LIFT STAY, WHICH WAS CONSOLIDATED WITH THE ADVERSARY PROCEEDING

ARTHUR J. GONZALEZ, Bankruptcy Judge.

Commencing on December 2, 2001, and continuing thereafter, Enron Corp. and certain of its affiliated entities (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors' chapter 11 cases are being jointly administered for procedural purposes pursuant to Rule 1015(a) of the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr.P."). The Debtors continue to operate their respective businesses as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. On December 12, 2001, pursuant to section 1102 of the Bankruptcy Code, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Creditors" Committee) in the Debtors' chapter 11 cases.

The Debtors have previously acknowledged that their "prior reported financial information for the fiscal years ended December 31, 1997 through 2000 and the first and second quarter of 2001 should not be relied upon." (*Debtors' Monthly Operating Statement for Period December 1, 2001 to December 31, 2001,* filed on April 22, 2002). In addition, on April 22, 2002, the Debtors' post-petition management indicated that financial information contained in the Debtors' "Form 10–Q filed with the SEC on November 19, 2001 should not be relied upon." *Id.*

In March 2001, Enron paid $375 million to acquire a company which owned and operated a paper mill, known as "Stadacona," in Quebec City, Canada. The acquisition of Stadacona was financed by Enron using internal funds. The paper mill is currently the principal asset of Enron's wholly-owned subsidiary, Compagnie Papiers Stadacona (n/k/a 4138198 Canada, Inc., herein defined as "CPS"). Enron engaged JP Morgan Chase Bank[1] ("Chase"), to arrange the refinancing of the funds that Enron had previously provided for the acquisition of the company that owned Stadacona. The refinancing was accomplished through a series of interrelated transactions that closed on June 22, 2001 (the "Interrelated Transactions"). Thus, in essence, in March 2001, Enron provided a bridge loan for the acquisition of the company that owned Stadacona until CPS could refinance the loan three months later in June 2001.

The Interrelated Transactions involved The Industrial Bank of Japan, Limited—predecessor in interest to Mizuho Corporate Bank, LTD. ("Mizuho")—and certain other financial institutions (collectively, the

---

1. Enron actually engaged the Chase Manhattan Bank, predecessor in interest to JP Morgan Chase. For ease of reference, and as it does not impact the analysis, references to "Chase" are either to JP Morgan Chase Bank or its predecessor in interest, the Chase Manhattan Bank.

"Bank Group");[2] Flagstaff Capital Corporation ("Flagstaff"), a subsidiary of Chase; Enron Corp. ("Enron") and several Enron-affiliated non-debtor entities, including CPS, and Hansen Investments Co. ("Hansen"), a wholly-owned subsidiary of CPS. On November 15, 2002, Mizuho and Banco Bilbao Vizcaya Argentaria S.A. ("Banco Bilbao")[3] filed a motion (the "Lift Stay Motion"), pursuant to section 362 of the Bankruptcy Code, seeking relief from the automatic stay or, in the alternative, deeming the automatic stay inapplicable to their exercise of certain rights and remedies against certain collateral that was pledged as security in connection with the Interrelated Transactions. The Debtors and the Creditors' Committee opposed the Lift Stay Motion. On January 9, 2003, the Court conducted a hearing (the "January 9, 2003 Hearing") regarding the Lift Stay Motion and the matter was taken under advisement.

Based upon this same series of transactions, on March 28, 2003, Mizuho and Banco Bilbao commenced an adversary proceeding by filing a complaint against Enron, CPS and Hansen (collectively, the "Defendants") in which they seek imposition of a constructive trust on certain of the Defendants' property.

The Defendants filed a Motion, dated June 16, 2003 (the "Motion to Dismiss"), in which they seek entry of an order dismissing the Complaint, pursuant to Fed. R. Bankr.P. 7012 and Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R.

Civ.P."). The Defendants contend that the Complaint should be dismissed because the plaintiffs lack standing to pursue the relief sought or, alternatively, the claims do not allege the necessary elements to establish a constructive trust or the allegations are otherwise insufficient to impose a constructive trust.

On September 5, 2003, various member of the Bank Group filed a motion, pursuant to Fed.R.Civ.P. 24, as incorporated by Fed. R. Bankr.P. 7024 and pursuant to § 1109(b) of the Bankruptcy Code, to intervene in this adversary proceeding as plaintiffs. The parties to the adversary proceeding entered into a stipulation resolving the motion and on October 2, 2003, the Court entered an order approving the parties resolution allowing the several Bank Group members to intervene as plaintiffs,[4] (Mizuho, Banco Bilbao, and the intervening plaintiffs are collectively referred to as the "Plaintiffs"). In addition, on September 26, 2003, Mizuho and Banco Bilbao filed a motion (the "Consolidation Motion"), pursuant to Fed. R. Bankr.P. 7042 and Fed. R. Bankr.P. 9014, seeking to consolidate the Lift Stay Motion with the adversary proceeding. On October 9, 2003, the Court entered an order granting the Consolidation Motion.

### The Allegations Concerning the Interrelated Transactions

As previously noted, the Interrelated Transactions were closed on June 22, 2001 and are described herein as set forth in the allegations of the Complaint.[5] The

2. The other member of the Bank Group include Chase, The Royal Bank of Scotland plc, and The Bank of Tokyo–Mitsubishi, Ltd., Houston Agency.

3. It is alleged that Banco Bilbao acquired its interest through assignment from four of the original lenders.

4. The intervening Bank Group plaintiffs are Chase, The Bank of Tokyo–Mitsubishi Ltd., Banca Nazionale del Lavoro S.p.A., and Goldman Sachs Credit Partners, L.P.

5. Inasmuch as a court considering a motion to dismiss a complaint, pursuant to Fed. R.Civ.P. 12(b)(6), must accept as true the allegations of the complaint, the Court extracts the description of the series of transactions

Bank Group entered into a Credit and Security Agreement, dated June 22, 2001 (the "Flagstaff Agreement"—in the Complaint defined as the "Bank Group Agreement") with Flagstaff, whereby the Bank Group loaned Flagstaff the aggregate principal amount of $375 million (the "Flagstaff Loan"). Chase entered into a separate loan agreement with Flagstaff whereby it loaned Flagstaff approximately $1 billion, which loan was repaid that same day.

Flagstaff entered into that certain Credit Agreement, dated as of June 22, 2001 (the "Hansen Loan Agreement"), whereby Flagstaff loaned Hansen approximately $1.4 billion (the "Hansen Loan"), upon which Hansen was to pay interest to Flagstaff during the term of the loan. Hansen's obligations to Flagstaff are also evidenced by a certain Promissory Note, dated June 22, 2001 (the "Hansen Note"). The Hansen Loan Agreement provides that, in the event the principal of the loan is prepaid (including as a result of acceleration following an Event of Default), Hansen will owe Flagstaff a "Make Whole Amount," consisting of accrued and unpaid interest as well as the present value of future interest that would have been owed had the principal not been prepaid. The Make Whole amount is approximately $360 million.

Pursuant to the Flagstaff Loan Agreement, Flagstaff's rights under the Hansen Loan Agreement, including with respect to the Make Whole Amount, were pledged to the Bank Group as security for the Flagstaff Loan. The Hansen Loan Agreement also provides that an "Enron Event" is an Event of Default. The definition of "Enron Event," by cross reference to that certain agreement between Enron and Flagstaff, dated as of June 22, 2001 (the "Enron Agreement"), includes Enron's insolvency or misrepresentations made by Enron.

Hansen in turn loaned approximately $1.4 billion to CPS, which used the proceeds to refinance Enron's intercompany bridge loan made to enable CPS to purchase Stadacona (the "Property"). To evidence its obligation on the $1.4 billion loan from Hansen, CPS gave to Hansen a promissory note (the "CPS Note") payable on demand or, if no demand is made, on June 23, 2006.

In a related transaction (the "Class A Subscription Agreement"), Hansen sold to Newman Investments Co. ("Newman"), a wholly-owned subsidiary of CPS, the right to acquire Class A Preferred Shares in Hansen at a future date (the "Subscription Payment Date") for an acquisition price of approximately $1.4 billion (the "Subscription Price Balance"). Pursuant to another agreement among Flagstaff, Hansen and Newman (the "Subscription Payment Assumption Agreement"), Newman transferred approximately $1 billion to Flagstaff, in return for which Flagstaff agreed to pay to Hansen, for Newman's account, the Subscription Price Balance Newman owed Hansen under the Class A Subscription Agreement.

Pursuant to a Warrant Agreement, dated June 22, 2001 ("Class B Warrant Agreement"), Hansen granted Flagstaff a warrant to purchase Class B Preferred Shares of Hansen (the "Class B Warrant"), exercisable by Flagstaff at any time unless and until an Event of Default occurred under the Hansen Loan Agreement. A transferee from Flagstaff of the Class B Warrant could exercise the Class B War-

from the Plaintiffs' complaint and accepts such as true only for the purpose of ruling on the motion to dismiss the complaint.

rant at any time. Pursuant to a Put Option Agreement, dated June 22, 2001 (the "Put Option Agreement"), Flagstaff was granted the right to "put" to Enron both (a) the Class B Warrant and (b) Flagstaff's "warrant rights" under the Hansen Loan agreement, including the right to the Make–Whole Amount (collectively, the "Warrant Rights"). The "put" price payable by Enron under the Put Option Agreement is the fair market value of the Class B Warrant and the Warrant Rights.

As part of the same transaction, Flagstaff and Enron entered into a Total Return Swap, dated as of June 21, 2001 (the "Swap"). The Swap provides that, on the day Flagstaff either exercised the Class B Warrant or "puts" the Class B Warrant to Enron, (a) Enron, as Fixed Rate Payer, will pay to Flagstaff the Make–Whole Amount, and (b) Flagstaff, as Floating Rate Payer, will pay to Enron either (i) the fair market value of the Class B Warrant if Flagstaff has tendered ("put") the Class B Warrant to Enron, or (ii) the subscription price paid by Flagstaff to acquire the Class B Shares plus the present value of the cumulative preferred dividend that has or will occur with respect to such shares, if Flagstaff has exercised the Class B Warrant.

Flagstaff's obligations to the Bank Group under the Bank Loan Agreement are secured by certain "Pledged Collateral" including, among other things, Flagstaff's rights under the Hansen Loan Agreement, Hansen Note, Warrant Agreement, Put Option Agreement, Swap Agreement and Enron Agreement (the "Security Interest"). This Security Interest is binding on the Flagstaff's successors and assigns, and has not been released. On June 27, 2001, UCC–1 financing statements covering the Pledged Collateral were filed with the Secretary of State of New York and the Secretary of State of Delaware.

On July 3, 2001, a UCC–1 financing statement covering the Pledged Collateral was filed in New York County, New York.

As part of the Plaintiffs' agreement to look solely to Enron in the event of a default, Flagstaff, in the Put Option Agreement waived any rights it might acquire, through an exercise of remedies against Hansen, to proceed against CPS, including with respect to the CPS Note.

### Subsequent Events

On or about November 30, 2001, Flagstaff sent Newman a notice (the "November 30 Notice") under the Subscription Payment Assumption agreement stating that the Subscription Payment Date had occurred. The Class A Subscription Agreement defines the Subscription Payment Date as the date on which the principal under the Hansen Loan Agreement is due (whether at maturity or earlier upon acceleration following an Event of Default). Also on or about November 30, 2001, Flagstaff delivered to Enron a Put Notice and Put Assignment under the Put Option Agreement.

On December 4, 2001, Chase, as agent bank, sent notices to Flagstaff and Hansen, respectively, declaring defaults and accelerating all amounts payable under the Bank Loan Agreement and Hansen Loan Agreement (the "Flagstaff Notice" and the "Hansen Notice" respectively), and thereby triggering Flagstaff's right to the Make Whole Amount.

On or about December 7, 2001, Flagstaff sent a notice of setoff of the $1.4 billion principal amount of the Hansen Loan against the $1.4 billion Subscription Price Balance under the Share Subscription Payment Assumption Agreement (the "Setoff Notice"). This left a remainder due from Hansen to Flagstaff of the approximately $360 million Make Whole Amount.

*The Parties' Contentions*

The Plaintiffs allege that the members of the Bank Group accepted the Enron risk, and waived any right to proceed against CPS and the CPS Note, in reliance on misrepresentations in Enron's financial statements which were provided to the Bank Group. Specifically, the Plaintiffs allege reliance on Enron's Form 10–K for the year ending December 31, 2000, and Form 10–Q for the first quarter of 2001, which showed Enron to have substantial shareholder equity and profitability.

In the Lift Stay Motion, Mizuho and Banco Bilbao (as the movants of the Lift Stay Motion, the "Lift Stay Movants")[6] seek relief from the automatic stay to proceed against the Pledged Collateral. The Lift Stay Movants argue that cause exists to grant relief from the automatic stay because Enron has no equity in the property and the property is not necessary for an effective reorganization, and the interest of Lift Stay Movants is not adequately protected.

The Lift Stay Movants argue that if the "put" was effective, the Bank Group's claim against Flagstaff under the Flagstaff Agreement is secured by a valid and perfected security interest in the Make–Whole Amount. The Lift Stay Movants contend that the transfer to Enron of Flagstaff's right to the Make–Whole Amount was subject to the Bank Group's security interest and the Debtors lack equity because the only economic value of the warrant rights is an amount equal to the Make–Whole Amount. The Lift Stay Movants further argue that the property is not necessary to an effective reorganization because its value is not available for general unsecured creditors of the Debtors' estates. The Lift Stay Movants also contend that the stay should be lifted because they have a perfected security interest in the Pledged Collateral which is not adequately protected.

Alternatively, Lift Stay Movants seek a determination that the "put" was ineffective to transfer the warrant and warrant rights to Enron such that they remain property of Flagstaff, and enforcement of their rights does not implicate estate property or the automatic stay. The Lift Stay movants contend that the "put" was ineffective because (i) it was not properly consummated according to its terms or (ii) it occurred postpetition and is void. With respect to their contention that the "put" was not properly consummated, the Lift Stay movants argue that although Flagstaff delivered a "put" assignment to Enron, Enron and its affiliates did not comply with the terms necessary to effectuate the "put" in that it did not deliver a notification of the purchase price calculation and there was no basis upon which to arrive at a price as Enron did not provide required financial statements. The Lift Stay Movants further argue that, in any case, Enron never paid a purchase price.

The Debtors and the Creditors' Committee (together, the "Lift Stay Objectors") object to the relief sought in the Lift Stay Motion. First, they argue that, individually, the members of the Bank Group do not have standing to act on behalf of the Bank Group. Rather, the Lift Stay Objectors contend that, pursuant to the terms of the Flagstaff Loan Agreement, only the Administrative Agent has standing to bring enforcement actions under the Flagstaff Loan Agreement. In any case, the Lift Stay Objectors argue that the members of the Bank Group hold no security interest granted by the Debtors. Rather, the Lift

---

6. As the Lift Stay Motion has been consolidated with the adversary proceeding, it is presumed that the intervening plaintiffs have adopted the Lift Stay Motion and, therefore, are also Lift Stay Movants.

Stay Objectors assert that the security interest which forms the basis of the Lift Stay Movants' claim was granted to them by a third party. The Lift Stay Objectors contend that the Bank Group has an unsecured claim as against the Debtors because by exercising the "put," Flagstaff transferred to Enron an "unsecured" right against Hansen to receive the Make–Whole Amount. The Lift Stay Objectors assert that as Flagstaff's right against Hansen was unsecured, it follows that Flagstaff's right as against Hansen that was "put" to Enron is also unsecured. The Lift Stay Objectors also argue that, in any event, the Lift Stay Movants have failed to establish cause to lift the automatic stay and have failed to prove the Debtors have no equity in the property. Rather, the Lift Stay Objectors contend that the Debtors have equity in the warrant rights, that the "put" option was properly exercised, and that maintaining control of the warrant rights is necessary for the Debtors' reorganization.

With respect to the adversary proceeding, the Defendants move to dismiss the Complaint. The Defendants again argue that pursuant to the terms of the Flagstaff Agreement, the Plaintiffs lack standing to pursue the relief sought and only Chase, as the Administrative and Collateral Agent, has standing to maintain any such proceeding. Alternatively, the Defendants argue that the claims do not allege the necessary elements to establish a constructive trust or the allegations are otherwise insufficient to impose a constructive trust.

The Plaintiffs object to the motion to dismiss and argue that they have standing to pursue the relief sought as they are not attempting to enforce the contract but, rather seek equitable relief and to impose a constructive trust. The Plaintiffs further argue that even if they were proceeding to enforce the agreement, the individu-al members of the Bank Group did not waive their rights to bring claims related to the Flagstaff Agreement. Thus, the Plaintiffs dispute that only Chase, as the Administrative and Collateral Agent, has standing to pursue such claims. The Plaintiffs further argue that they have sufficiently alleged a claim for imposition of a constructive trust to withstand a motion to dismiss and that constructive trusts are a recognized form of relief in bankruptcy cases. A hearing on the Motion to Dismiss was held on October 2, 2003 (the "October 2, 2003 Hearing").

### DISCUSSION

██ Fed.R.Civ.P. 12(b)(6) is incorporated into bankruptcy procedure by Fed. R. Bankr.P. 7012(b). In considering a Fed.R.Civ.P. 12(b)(6) motion to dismiss for failure to state a claim for relief, the court accepts as true all material facts alleged in the complaint and draws all reasonable inferences in favor of the plaintiff. *Bolt Electric, Inc. v. City of New York*, 53 F.3d 465 (2d Cir.1995). The motion to dismiss is granted only if no set of facts can be established to entitle the plaintiff to relief. *Walker v. City of New York*, 974 F.2d 293, 298 (2d Cir.1992). In reviewing a Fed. R.Civ.P. 12(b)(6) motion, the court may consider the allegations in the complaint; exhibits attached to the complaint or incorporated therein by reference; matters of which judicial notice may be taken; *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir.1993); and documents of which plaintiff has notice and on which it relied in bringing its claim or that are integral to its claim. *Cortec Industries v. Sum Holding, L.P.*, 949 F.2d 42, 48 (2d Cir.1991). However, mere notice or possession of the document is not sufficient. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002). Rather, a necessary prerequisite for the court's consideration of the document is that a plain-

tiff relied "on the terms and effect of a document in drafting the complaint." *Id.* As such, the document relied upon in framing the complaint is considered to be merged into the pleading. *Id.* at 153 n. 3. (citation omitted). In contrast, when assessing the sufficiency of the complaint, the Court does not consider extraneous material because considering such would run counter to the liberal pleading standard which requires only a short and plain statement of the claim showing entitlement to relief. *Id.* at 154.

■ To survive a motion to dismiss, a plaintiff only has to allege sufficient facts, not prove them. *Koppel v. 4987 Corp.*, 167 F.3d 125, 133 (2d Cir.1999). A court's role in ruling on a motion to dismiss is to evaluate the legal feasibility of the complaint, not to undertake to weigh the evidence which may be offered to support it. *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir.1998).

Thus, for the purposes of the Motion to Dismiss, the Court accepts as true all of the material allegations in the Plaintiff's complaint.

*Standing to Pursue the Relief Sought*

■ Pursuant to Article VIII of the Flagstaff Agreement, each of the members of the Bank Group irrevocably appointed Chase as Administrative and Collateral Agent "to take such action on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof, together with such actions and powers as are reasonably incidental thereto."

In section 9.06 of the Flagstaff Agreement, Flagstaff irrevocably appointed the Collateral Agent as Flagstaff's

"attorney-in-fact, with full authority in the place and stead of [Flagstaff] and in the name of [Flagstaff] or otherwise, upon the occurrence and during the continuance of an Event of Default, to take any action and to execute any instrument that the Collateral Agent, in its reasonable judgment, deems necessary or appropriate to accomplish the purposes of this Agreement, including, without limitation, to make demand on Hansen, Enron, the Swap Counterparty or any other Borrower Obligor all amounts due under each Assigned Agreement [7] to which [Flagstaff] is a party, to receive, endorse and collect all instruments made payable to [Flagstaff] representing any payment or other distribution in respect of the Pledged Collateral or any part thereof and to give full discharge for the same, and to file any claims or take any action or institute any proceedings that the Collateral Agent, in its reasonable judgment, may deem necessary for the collection of any of the Pledged Collateral or otherwise to enforce compliance with the terms and conditions of each Assigned Agreement or the rights of the Collateral Agent with respect to any of the Pledged Collateral."

In addition, pursuant to Article VIII of the Hansen Loan Agreement, Flagstaff irrevocably appointed Chase as Administrative Agent and authorized it to exercise such powers as were delegated to the Administrative Agent by the terms of the Hansen Loan Agreement.

Article IX of the Flagstaff Agreement which concerned the grant of the Security Interest in the Pledged Collateral provided that

[Flagstaff] irrevocably pledges, transfers and assigns to the Collateral Agent

---

7. The Assigned Agreements are defined in the Flagstaff Agreement to include the Hansen Loan Agreement, the Hansen Note, the Enron Agreement, the Class B Warrant Agreement, the Put Option Agreement, and the Swap.

for its benefit and the benefit of the [members of the Bank Group], the Swap Counterparty and the Administrative Agent, and grants to the Collateral Agent for its benefit and the benefit of the [members of the Bank Group], the Swap Counterparty and the Administrative Agent, a security interest in, all right, title and interest of [Flagstaff] (whether now owned or hereafter acquired) in, to and under the [Pledged Collateral].

The Pledged Collateral included, among other things, the Assigned Agreements, including all of Flagstaff's rights to receive monies and other property due and to become due to Flagstaff under or pursuant to any of the Assigned Agreements and all of Flagstaff's claims for damages arising out of or for breach of or default under the Assigned Agreements. The Pledged Collateral also included the account (the "Operating Account") which Flagstaff, nominally, established and maintained with Chase but which was subject to the exclusive control of the Collateral Agent.

Pursuant to the terms of the Flagstaff Agreement, Chase, as Administrative Agent, was given the right to sue Flagstaff on behalf of the individual members of the Bank Group and Chase, as Collateral Agent, was given the right to sue the Defendants to foreclose on the Pledged Collateral. Flagstaff is the direct lender to Hansen and in that capacity holds an unsecured interest in the Pledged Collateral. The interest held by the members of the Bank Group is a security interest against Flagstaff's *rights*, not directly against Hansen.

■ Ordinarily, the rights, duties and obligations of parties to a contract are dictated by the terms of their agreement. *Credit Francais Int'l S.A. v. Sociedad Financiera de Comercio, C.A.*, 128 Misc.2d 564, 581–82, 490 N.Y.S.2d 670, 684 (N.Y.Sup.Ct.1985)[8]. The *Credit Francais* case concerned a group of banks who formed a consortium to lend money to a certain borrower. The agreement included the appointment of an agent and further provided that each lending bank "irrevocably authorizes the Agent to take such action on [each lending bank's] behalf and to exercise such powers [under the Agreement] as are specifically delegated to the Agent in [the] Agreement." *Credit Francais*, 128 Misc.2d at 578, 490 N.Y.S.2d at 681. The court noted that the title page of the agreement recited that it was between the borrower and the Agent bank, as agent and as manager, while the various lending banks were referred to collectively as the "depositors." *Credit Francais*, 128 Misc.2d at 578, 490 N.Y.S.2d at 681. The court referenced other terms of the contract including that (i) the agent was to determine the interest rate for all the lending banks, (ii) the Agent was responsible for making pro rata distribution to the lending banks of any principal, interest and other amounts received, and (iii) the agent was to declare any acceleration of the amount due under the agreement (either with the consent of or at the direction the majority of the lending banks), as establishing "that in virtually all aspects of the relationship [the] only ... institution empowered to act on behalf of all the lending banks" was the agent. *Credit Francais*, 128 Misc.2d at 577–78, 490 N.Y.S.2d at 681.

When dealing with such lending arrangements, the purpose of contracting in

8. Most of the Operative Documents that comprise the Interrelated Transaction, including the Flagstaff Agreement, the Hansen Loan Agreement, and the Enron Agreement, provide that they are to be governed and construed in accordance with the laws of the State of New York.

advance to restrict enforcement to a single agent is to prevent the chaos that would ensue if multiple lawsuits were initiated by each lending bank with, possibly, divergent interests. *Credit Francais*, 128 Misc.2d at 579, 490 N.Y.S.2d at 682. Allowing the agent to pursue collective enforcement in the event of a default allows for unified action and prevents any single lender from being preferred over another. *Credit Francais*, 128 Misc.2d at 580–81, 490 N.Y.S.2d at 683. The *Credit Francais* court found that based on the terms of the contract, the parties contemplated that there would be collective action taken by the agent on behalf of all members of the consortium, or pursuant to the direction of the majority of the lending banks. *Credit Francais*, 128 Misc.2d at 578–79, 490 N.Y.S.2d at 682. Thus the *Credit Francais* court dismissed the action brought, individually, by a lender bank because it found that the plaintiff was not a proper party and had no standing, individually, to sue the borrower. *Credit Francais*, 128 Misc.2d at 583, 490 N.Y.S.2d at 684.

The Plaintiffs rely on *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 243 (2d Cir.1994), to argue that as an undisclosed principal, the Plaintiffs have standing to sue on the Flagstaff Agreement. The *Commercial Bank* case also involved a syndicate of bank lenders where a lead bank was appointed agent under the parties' agreement. *Commercial Bank*, 15 F.3d at 242. Although, the court found that, notwithstanding the appointment of a lead bank, an individual participating bank who was a member of the lending syndicate had standing to enforce the agreement, the court recognized that the result would be different if the parties to the contract had expressly or impliedly reserved that right to certain parties. *Commercial Bank*, 15 F.3d at 243. The *Commercial Bank* court found that the terms of the contract at issue there did not "expressly or impliedly" preclude the plaintiff in that case, who was one of the individual lenders of a consortium of lenders, from bringing the action. *Id.* After noting that, pursuant to the terms of the agreement, the lead bank was authorized to sue "only if requested to do so my the [majority of the lending banks]," the court found that narrow grant of power to the lead bank did not abrogate the rights of participating banks to sue individually. *Id.* The court further found that other language of the agreement was consistent with this interpretation as the parties expressly reserved their rights "under the general law." *Id.* Thus, the reasoning of the *Commercial Bank* case is consistent with that of the *Credit Francais* case and requires that a court review the terms of the particular contract.

The language utilized in the Flagstaff Agreement is similar to the language of the contract at issue in the *Credit Francais* case. The Flagstaff Agreement provides that each of the members of the Bank Group "irrevocably appoints" Chase as Administrative and Collateral Agent "to take such action on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof, together with such actions and powers as are reasonably incidental thereto." In addition, in the *Credit Francais* agreement, the agent had discretion on whether to exercise its power to take action under the Agreement except when required to take action by written direction of the majority of the banks. *Credit Francais*, 128 Misc.2d at 578–79, 490 N.Y.S.2d at 682. Similarly, Article VII of the Flagstaff Agreement provides that if the Events of Default therein described occurred, "the Administrative Agent may, and at the re-

quest of the Required Lenders [9] shall ... declare the Loans then outstanding to be due and payable." There are other terms of the Interrelated Agreements that are analogous to the terms of the *Credit Francais* Agreement. Pursuant to the Flagstaff Agreement, Chase was appointed Flagstaff's Collateral Agent. Under the terms of the Hansen Agreement, the Collateral Agent had control over the Operating Account to which Hansen would make payments under the Hansen Agreement. The Flagstaff Agreement directed that payments from the Operating Account were to be disbursed to the Administrative Agent for the account of the members of the Bank Group.

In support of their claim that they have a right to sue individually, the Plaintiffs direct the Court's attention to Section 11.02 of the Flagstaff Agreement which provides that failure to exercise any right or power under the Agreement does not operate as a waiver of such right or power. However, this section does not authorize individual members of the Bank Group to act when the Administrative Agent does not act. Rather this section only provides that if the Administrative Agent, Collateral Agent or Lenders do not exercise any right or power which they have under the Flagstaff Agreement, such right or power is not waived. Thus, section 11.02 of the Flagstaff Agreement is not a source of authority for the individual members of the Bank Group to enforce the Flagstaff Agreement. The section merely preserves whatever rights they have to require performance.

Article VIII of the Flagstaff Agreement allows either the Administrative Agent or the Collateral Agent, in its discretion, to determine whether to exercise any of the rights or powers delegated to it under the Flagstaff Agreement, unless the Required Lenders—which comprise the majority of the aggregate amount of loans advanced by the members of the Bank Group—make demand in writing on the Administrative Agent or Collateral Agent to exercise a right or power expressly contemplated under the Flagstaff Agreement, in which case, it is mandatory that the Administrative Agent or Collateral Agent exercise the right or power demanded. If the Administrative Agent or Collateral Agent then fails to act after the Required Lenders have made demand in writing, the recourse for the Required Lenders is to seek to require the Administrative Agent or Collateral Agent to act in accordance with the demand. In most instances, Article VIII of the Flagstaff Agreement limited the duties of the Administrative Agent and Collateral Agent concerning their respective responsibility to take discretionary action and exercise discretionary powers delegated to them. Nevertheless, Article VIII expressly preserved the duty of the Administrative Agent and Collateral Agent to take action and exercise rights or powers delegated to them under the Flagstaff Agreement when the Required Lenders made demand in writing.

The Plaintiffs next argue that they may act individually because the Flagstaff Agreement provides that the members of the Bank Group are expected to act on their own when deemed necessary. The Plaintiffs reference Article VIII of the Flagstaff Agreement which requires each Lender to independently and without reliance upon the Administrative Agent, the Collateral Agent or any other lender make its own decisions on whether or not to take

---

**9.** Required Lenders are defined in the Flagstaff Agreement as members of the Bank Group holding at least 51% of the then aggregate unpaid principal amount of the loans made by the members of the Bank Group to Flagstaff.

any action related to the Flagstaff Agreement.

This provision of Article VIII, however, does not authorize the members of the Bank Group to act individually to enforce the Flagstaff Agreement. Rather, it addresses the concerns of the Administrative Agent and the Collateral Agent that they not have responsibility for the other lending banks' decisions and to ensure that the lenders do not assert that they relied upon either of the Agents' analysis of (i) any risks involved or (ii) whether any actions should be taken under the agreement.[10] C. Menges, *Minimizing the Lead Lender's Liability to Co–Lenders in Syndicated Loans*, 19 No. 2 Prac. Real Est. Law. 17, 20 (2003).

In support of their contentions, the Plaintiffs also reference Article VII of the Flagstaff Agreement which provides that "the Administrative Agent, the Collateral Agent and the Lenders shall have, in addition to all other rights and remedies under this Agreement or otherwise, all other rights and remedies provided under the UCC of each applicable jurisdiction and other applicable laws, which rights shall be cumulative." This section merely establishes that the Plaintiffs could enforce whatever rights they had that were not inconsistent with the Flagstaff Agreement, including their right to file UCC statements against Flagstaff. A provision declaring that rights granted are cumulative is intended to preserve available alternate remedies when a party initially elects to pursue other available remedies. *Credit Francais*, 128 Misc.2d at 579–80, 490 N.Y.S.2d at 682. Moreover, an agreement should be read as a whole, and portions should not be taken out of context and interpreted in a manner that will thwart "the overall contractual scheme." *Credit*

*Francais*, 128 Misc.2d at 580–81, 490 N.Y.S.2d at 683. Here, the overall scheme, with certain exceptions, was to have Chase, as Administrative Agent and Collateral Agent, act for the benefit of the Bank Group.

In support of their position, the Defendants cite to *In re Okura & Co.*, 249 B.R. 596 (Bankr.S.D.N.Y.2000) where the court found that, pursuant to the parties' participation agreement, only the lead lender had a right to enforce a letter of credit agreement. The Defendants argue that the structure of the Interrelated Transaction is similar to the transaction in that case. The *Okura* court distinguished between types of multiple lending agreements, including participation agreements and syndication agreements. *Okura*, 249 B.R. at 608. The *Okura* court found that a loan participation "involves two independent, bilateral relationships: the first between the borrower and the lead bank and the second between the lead bank and the participants." *Okura*, 249 B.R. at 608. In a participation, an individual participant cannot assert a claim against the borrower. *Id.* The court also noted that in a syndication, where a group of banks jointly lends money, if each lender has an individual note, it may have recourse against the borrower. *Id.*

In a participation, an originating lender sells participation interests in a loan to other lenders. C. Menges, *Minimizing the Lead Lender's Liability to Co–Lenders in Syndicated Loans*, 19 No. 2 Prac. Real Est. Law. 17 (2003). In such case, only the originating lender has privity of contract with the borrower and the terms of the agreement set forth the rights of the other participating lenders. *Id.* at 17–18. In a syndication, the originating lender

---

10. This provision also shields the members of the Bank Group from claims that other members of the Bank Group may have relied on their analysis.

and the other lenders are parties to the loan agreement and each lender forms a direct relationship with the borrower. *Id.* at 18. The originating lender, which usually is appointed the lead lender, invariably seeks to limit its duties and responsibilities in the loan agreement. *Id.*

The Plaintiffs argue that the arrangement to which they subscribed was a syndication, not a participation. The Plaintiffs further argue that, under the Flagstaff Agreement, the members of the Bank Group could obtain individual promissory notes from the borrower. However, the borrower under the Flagstaff Agreement was Flagstaff, and the bank lenders' right to obtain such promissory notes from Flagstaff does not augment their standing to sue the Defendants directly.

The layers of the arrangement that formed the Interrelated Transaction appears to have cast the members of the Bank Group as both members of a syndicate *vis-a-vis* Flagstaff and as members of a participation *vis-a-vis* Hansen and Enron. With respect to both Hansen and Enron, the members of the Bank Group were parties to two independent, bilateral relationships: the first between the members of the Bank Group and Flagstaff and the second between Flagstaff and either Enron or Hansen. The members of the Bank Group were rendered further remote from the, respective, second relationships by Flagstaff's irrevocable appointment of Chase as Collateral Agent and attorney-in-fact to enforce the terms of the various agreements and rights in the Pledged Collateral. Thus, even if the members of the Bank Group have direct rights against Flagstaff, they do not as against Hansen, Enron, CPS or Newman.

The Plaintiffs next argue that even if the Flagstaff Agreement, by its terms, vests the Collateral Agent with exclusive power to enforce the agreement, nevertheless, the Plaintiffs' may pursue equitable claims based upon "unjust enrichment" theories, as such claims are not seeking to enforce the contract.

However, any attempt to recover the "Pledged Collateral," which only arises by virtue of the Interrelated Transactions, must be an attempt to recover pursuant to the contract. Moreover, section 9.06 of the Flagstaff Agreement makes clear that the parties contemplated that upon an event of default, Chase, as Collateral Agent, would file "*any* claims or take *any* action or institute *any* proceedings" that Chase found necessary to collect on or enforce its rights with respect to the Pledged Collateral. Thus, the parties contemplated that Chase, as Collateral Agent, would pursue any action concerning their rights in the Pledged Collateral.

Moreover, the Plaintiffs' allegations based upon fraud for which they seek equitable relief are premised upon misrepresentations in the financial information Enron provided to the Bank Group. However, the parties specifically contracted for just such an event. Pursuant to the Flagstaff Agreement, an event of default includes an "Enron Event" as defined in Enron Agreement. Pursuant to the Enron Agreement, an "Enron Event" occurs when "[a]ny representation or warranty made by Enron (or any of its officers) under or in connection with a Operative Document shall prove to have been incorrect in any material respect when made or deemed made and such materiality is continuing." One of the representations made by Enron was that financial information provided "fairly present ... the consolidated financial position of Enron and its subsidiaries." Thus, the terms of the Flagstaff Agreement expressly provides for the remedy in the event that there was a misrepresentation by Enron

concerning the provided financial information.

Finally, the Plaintiffs argue that because most of the banks that are now members of the Bank Group, including Chase, have intervened in this adversary proceeding, the standing issue is moot. In addition, the Plaintiffs contend that by virtue of the unified participation by most of those banks, the potential for conflict that provides the justification for precluding individual action has been eliminated.

The Defendants counter that the standing issue is not moot because Chase has joined the action in its individual capacity and not in its capacity as Collateral Agent. The Defendants contend that the Flagstaff Agreement requires Chase, in its capacity as Collateral Agent, to file any action or institute any proceeding against the Defendants.

The Court finds that the standing issue is not moot and any action against the Defendants under the Interrelated Agreements must be taken by Chase, not individually but in its capacity as Collateral Agent. As previously noted, ordinarily, the rights, duties and obligations of parties to a contract are dictated by the terms of their agreement. While the joinder of most, or even all of the members, of the

Bank Group could result in the elimination of inter-creditor conflict, the happenstance of that event does not impact on the terms of the Agreement as negotiated by the parties. Indeed, if the parties desired such a result, they could have negotiated to allow the individual members of the Bank Group to sue individually if all members joined in the lawsuit or even if a majority joined in any such suit. Instead, pursuant to the terms of the Flagstaff Agreement, the desire of a majority of the members of the Bank Group—which majority was defined as the Required Lenders—to enforce compliance with the agreements could only be implemented by Chase, as Collateral Agent, after written demand was made upon Chase, as Collateral Agent, by the Required Lenders.

Thus, the Court finds that the standing issue is viable and the Plaintiffs lack standing to maintain the adversary proceeding. As such, the adversary proceeding should be dismissed.[11]

For the same reasons as detailed with respect to the Motion to Dismiss, the Lift Stay Movants lack standing to pursue the Lift Stay Motion. Indeed, the lack of standing is even more apparent in the context of the Lift Stay Motion in that the Lift Stay Movants seek to lift the stay

---

**11.** Inasmuch as the Court dismisses the adversary proceeding because the Plaintiffs lack standing to pursue the relief sought, the Court does not reach the issue of the viability of a constructive trust cause of action in the context of a case where the allegations of fraud are not of a particularized nature but, rather, are general allegations of fraud applicable to most creditors. Indeed, the allegations of reliance on Enron's public financial statements are the same prevalent, general allegations that have been asserted by most creditors who either extended credit or services to the Debtors.

The Court does, however, note that while the Plaintiffs repeatedly reference the Enron Corp. Examiner's Report and the Senate Report, which criticize the fraudulent nature of the Interrelated Transaction, the fraud upon which those reports focused relates to the tax avoidance nature of the Interrelated Transaction resulting from the "sham" loan and not the alleged misrepresentations regarding Enron's ability to repay the loan. Indeed, although various Examiner and governmental reports have roundly criticized the dissemination of false financial information, it has been in the context of, and with respect to, every creditor.

The Court does not express any opinion on whether the members of the Bank Group had actual knowledge of the alleged sham aspect of the Interrelated Transaction or whether knowledge should be imputed to them.

specifically to enforce their rights under the Flagstaff Agreement. As the Lift Stay Movants lack standing to pursue the Lift Stay Motion, such motion, as consolidated with the adversary proceeding, is denied.

Based upon the foregoing, it is hereby

Ordered, that because the Plaintiffs lack standing to pursue the relief sought, the Motion to Dismiss the Complaint in this adversary proceeding is granted; and it is further

Ordered, that because the Plaintiffs lack standing to pursue the relief sought, the Lift Stay Motion, as consolidated in the adversary proceeding, is denied.